# Illinois Official Reports

## Appellate Court

---

### *People v. Turner*, 2018 IL App (1st) 170204

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SIMUEL TURNER, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-17-0204 |
| Filed<br>Rehearing denied | February 2, 2018<br>March 14, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-12101; the Hon. Anna H. Demacopoulos and the Hon. Allen Murphy, Judges, presiding. |
| Judgment | Affirmed; motion denied. |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Justices Connors and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant-appellant Simuel R. Turner appeals from his conviction and sentencing upon two counts of aggravated driving under the influence of alcohol (DUI). For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3     Shortly after 10 p.m. on July 2, 2011, the defendant's pickup truck collided with a motorcycle carrying two persons. The driver of the motorcycle, James McFall, was killed; his wife, Kasey McFall, sustained serious injuries. The defendant was taken to the emergency room at St. James Hospital, where two blood samples were drawn from him. The first blood draw was taken pursuant to a physician's order as a part of his emergency room treatment, at approximately 10:46 p.m. At the request of police, nurses performed a second blood draw for inclusion in a "DUI kit" shortly after midnight on July 3, 2011. Both tests indicated that the defendant's blood alcohol content was above the legal limit. The defendant was charged with 10 counts of aggravated DUI and reckless homicide.

¶ 4     Before trial, the defendant moved to suppress the results of the second blood test used in the DUI kit. At a hearing on the motion, the defendant testified that at the hospital, he was asked for a blood sample "around three to four times" by nurses, in the presence of police. He stated that he "continually asked the reason why they wanted to draw blood" but was given no reason. He also stated that he expressed his wish to speak to an attorney. He further testified that at some point he was told "that in order for me to go home that I would have to give a blood sample." He claimed that he never consented to the DUI kit blood draw.

¶ 5     Ryan Murphy, who was an officer of the Matteson Police Department in July 2011, testified at the pretrial hearing that he was dispatched to the accident site, where he saw the defendant before he was transported to the hospital. A short time later, Officer Murphy observed the defendant at the hospital. He noted that the defendant's speech was slurred and "his eyes were glassy and blood shot." He requested that medical personnel obtain a blood sample for a DUI kit; he was present when the blood was drawn. Officer Murphy testified that he was not present for the earlier blood draw.

¶ 6     In arguing for suppression of the DUI kit, the defendant's counsel asserted that the blood draw was unlawful pursuant to the United States Supreme Court's decision in *Missouri v. McNeely*, 569 U.S. 141 (2013). The State argued that *McNeely* was distinguishable and that the DUI kit blood draw was permissible under section 11-501.2 of the Illinois Vehicle Code (Code), which states that "if a law enforcement officer has probable cause to believe that a motor vehicle driven by *** a person under the influence of alcohol *** has caused the death or personal injury to another, that person shall submit, upon the request of a law enforcement officer, to a chemical test or tests of his or her blood, breath or urine for the purpose of determining the alcohol content thereof." 625 ILCS 5/11-501.2(c)(2) (West 2010).

¶ 7     In its findings, the trial court first noted that because the defendant was taken to the emergency room for purposes of treatment, the initial blood draw was admissible under section 11-501.4 of the Code. *Id.* § 11-501.4. With respect to the second blood draw, the trial court did not find that the defendant refused or was coerced. The trial court proceeded to find that the second blood draw was admissible under section 11-501.2(c)(2) of the Code. The trial court

thus denied the motion to suppress. The defendant's motion to reconsider that ruling was denied.

¶ 8    A bench trial commenced in September 2014. The State's first witness was Kasey McFall, who did not remember anything from the collision. She described her injuries from the accident, which led to insertion of a metal rod in her left leg and limited her ability to use her left arm.

¶ 9    The State next called Cheryl Feldner Gozzi. On the evening of July 2, 2011, Gozzi was driving westbound on Vollmer Road when she approached the intersection of Vollmer Road and Cicero Avenue. She recalled a car in front of her was "slowing down for the yellow light, so I was slowing down as well." As she was in the right lane, a motorcycle passed her on the left and proceeded into the intersection. She testified repeatedly that the traffic light was yellow at that time. Gozzi heard an impact but did not see the collision.

¶ 10    Melvin Respress testified that on the night of the collision, he was driving westbound on Vollmer Road in the right-hand lane as he approached the intersection with Cicero Avenue. He recalled that "the light was yellow and there was a motorcycle in front of me." He testified: "I was stopping and it appears as though the motorcycle was as well. I think he may have decided that, okay, I can still get this light; so he—he seemed to accelerate and went *** through the intersection." Respress also saw a truck heading eastbound on Vollmer Road that began to make a left-hand turn onto Cicero Avenue.

¶ 11    Respress recalled that the motorcycle's rear wheel was "shaking back and forth, which looked like it couldn't stop at that point because of the acceleration" and that the motorcycle "made impact with the truck." Respress "c[ould] not say for sure" what color the traffic light was when the motorcycle entered the intersection.

¶ 12    On cross-examination, Respress testified that the motorcycle switched into the left lane, and initially slowed down before accelerating into the intersection. Asked by defense counsel if "the motorcycle entered the intersection as the light was changing from yellow to red," Respress answered: "I'm not one hundred percent sure of that."

¶ 13    The State next called Luciana Cardona. Cardona acknowledged that she had an outstanding warrant in another case, but she agreed that the State made no promises to her in connection with her trial testimony in this case. Cardona testified that she was driving north on Cicero Avenue when she approached the intersection, where she planned to turn left onto Vollmer Road. She stopped at the intersection because she had a red light. As she was waiting for her light to change, she noticed that the lights for traffic on Vollmer Road turned yellow. She recalled that "when I looked over to my left I seen a truck coming. I thought that it was gonna stop, but it just [kept] going through the yellow light." The truck was heading east, "getting ready to make a left-hand turn going north on Cicero." She saw the truck "[j]ust go through the yellow light" and stated that it "never slowed down." She did not see the collision.

¶ 14    Officer Ryan Murphy also testified at trial. When he arrived at the crash scene, he saw a "motorcycle partially under the front end of the truck." He also saw the body of James McFall and then saw Kasey McFall, who was "wrapped around the stop light pole" on the northwest corner of the intersection.

¶ 15    Similar to his testimony at the suppression hearing, Officer Murphy recalled that the defendant's "speech was slurred and mumbled" when he spoke to hospital staff and that his eyes were "glassy and bloodshot." Officer Murphy stated that he gave a nurse a DUI test kit

containing vials for blood and urine samples. He observed a nurse perform a blood draw for the DUI kit, which he placed into the evidence locker at the police station.

¶ 16   Dana Escamilla, a nurse, recalled speaking with the defendant in the emergency room. According to Escamilla's records, the defendant admitted to Escamilla that he was drinking alcohol before the accident. Escamilla testified that a physician ordered "standard lab work" for the defendant, and so Escamilla drew blood samples for the hospital's lab. Escamilla's notes indicated the first blood draw was conducted at 10:46 p.m. The lab work indicated a blood alcohol serum level of 0.168. Escamilla's notes also indicated that another nurse, Nicole Pisterzi, conducted a separate blood draw at 12:11 a.m. on July 3, 2011, as part of a DUI kit. Pisterzi also testified that she performed a blood draw after Officer Murphy requested a DUI kit.

¶ 17   Officer Raymond Smith testified that he recovered the DUI kit from the evidence locker on July 5, 2011, and transported it to the Illinois State Police Crime Lab (crime lab) in Joliet on July 7. He acknowledged that the DUI kit was not refrigerated during this time period.

¶ 18   An evidence technician at the crime lab in Joliet testified that she received the DUI kit on July 7, 2011, and placed it in a refrigerated vault. She subsequently mailed the DUI kit to the Springfield crime lab for testing. The DUI kit was not refrigerated when it was mailed.

¶ 19   On July 13, 2011, the DUI kit was received by Alexandra Baluka of the Illinois State Police Division of Forensic Services in Springfield. She opened the DUI kit, inventoried it, and labeled each vial. One vial contained eight milliliters of blood, and the second had seven milliliters. She put the samples in a refrigerated storage vault to be reviewed by an analyst.

¶ 20   Dareea Patrick Paiva, a forensic scientist with the crime lab in Springfield, testified as an expert in the field of forensic toxicology. She described her procedure for analyzing blood samples for alcohol content using gas chromatography, which she testified was a scientifically accepted methodology.

¶ 21   Paiva analyzed one of the vials of blood from the DUI kit, which indicated an ethanol level of 0.118 grams per deciliter, greater than the legal limit of 0.08 grams per deciliter. She saw no evidence of contamination, clotting, or decomposition in the blood vials.

¶ 22   Paiva testified that the vials in a DUI kit contain an anticoagulant (potassium oxalate) to prevent clotting, as well as a preservative (sodium fluoride), to prevent fermentation. She denied that refrigeration of a sample is needed for these chemicals to be effective. She also testified that "underfilling [vials] does not interfere with the analysis of the test."

¶ 23   Paiva explained that serum alcohol level has higher ethanol content than whole blood. To convert serum level to whole blood level, the serum level is divided by 1.18. Applying this formula, she testified that a serum blood alcohol level of 0.168—the measurement from the defendant's first blood draw—equates to a 0.142 whole blood alcohol level.

¶ 24   On cross-examination, Paiva acknowledged that the crime lab was undergoing an audit in August 2011 by Forensic Quality Services (FQS) for "accreditation under ISO [International Organization for Standardization] 17025." She acknowledged that the FQS audit cited the lab for failing to report a "measurement of uncertainty." On re-direct examination, Paiva explained that the measurement of uncertainty is a "plus or minus" margin of error, analogous to that used in a political poll. She testified that this was not required for accreditation in 2011, and that the crime lab never lost accreditation.

¶ 25    The State also called Rick Coulom of the Village of South Chicago Heights Police Department, who testified as an expert in motor vehicle accident reconstruction. Coulom testified that he arrived at the scene around 10:45 p.m. on the night of the accident. When he arrived, the motorcycle was "stuck under the front of the truck" in the northwest quadrant of the intersection. The truck was facing northeast, and the motorcycle faced northwest. Coulom did not see "pre-impact or post-impact skid marks or tire marks."

¶ 26    Coulom observed the traffic signals at the site. He testified that the lights on Cicero Avenue are on the same cycle, meaning that the light for southbound traffic shows the same color as the light for northbound traffic. The traffic signals on Vollmer Road for eastbound and westbound traffic were also on the same cycle. Coulom and other investigators created a scale diagram of the intersection which he referred to during his testimony. He also referred to photographs of the accident scene and his report of the investigation.

¶ 27    Coulom found that the pickup truck suffered "mainly front-end damage." The motorcycle also had "mainly front-end damage" as well as some damage to its left side. Based on the extent of deformation of the motorcycle's wheelbase, Coulom calculated that the motorcycle's speed at impact was approximately 25 miles per hour. Using another formula, he determined "an approximate speed of 23 miles per hour which was consistent with the 25 [miles per hour] I got with the wheelbase deformation." He applied a separate "energy formula" to estimate that the pickup truck's speed was between 13 and 15 miles per hour at the time of the collision.

¶ 28    Officer Coulom testified that the pickup truck's "black box" data recorder reflected that five seconds prior to the crash, the truck's speed was approximately 10 miles per hour. The recorder indicated that the truck's brakes were applied five seconds before the impact. When the state's attorney asked if Coulom could determine "which vehicle struck which vehicle," he answered: "Not definitively I couldn't. They arrived at that spot I believe about the same time."

¶ 29    The cross-examination of Coulom by defense counsel included the following exchange:

"Q. Okay. You ultimately concluded that the lights were changing from yellow to red when the motorcycle entered the intersection, correct?

A. According to the witnesses.

Q. Okay. You made no such conclusion about the traffic lights for the Chevy S-10 Pick-Up, correct?

[STATE'S ATTORNEY]: Judge, I'm going to object again.

THE COURT: I'm going to sustain that.

[DEFENSE COUNSEL]: Well, Judge, he is offering an expert opinion. He offered it as to the motorcycle.

THE COURT: Right.

[DEFENSE COUNSEL]: It is certainly relevant as to his opinion on the truck. That's why we are here.

[STATE'S ATTORNEY]: I object to the motorcycle question, too, Judge.

THE COURT: It is going to be sustained. He is not going to render an opinion as to what the lights were, yellow or red. That's based on rank hearsay evidence. I understand it is an expert's opinion, but I'm not going to let him testify to an ultimate opinion here. Whether the light is red or yellow is very, very important in this case and I'm going to make that determination.

[DEFENSE COUNSEL]: I respect that, Judge, completely.

THE COURT: He will not be allowed to render an opinion as to the color of the light at any point when the motorcycle breached the intersection or otherwise."

Defense counsel then asked Coulom if he could determine "who was at fault for this accident." The State objected, and the court sustained the objection.

¶ 30    Following Coulom's testimony, the parties stipulated that the physician who autopsied James McFall would state that his body tested negative for ethanol or for opiates, and that he died as a result of the accident. The parties also stipulated that Dr. Steven Salzman, a trauma specialist, would testify that Kasey McFall was diagnosed with severe traumatic brain injury, numerous fractures, and other injuries.

¶ 31    The court also admitted as exhibits the DUI kit, the hospital lab result of the defendant's blood serum alcohol level, and the medical records described by nurse Escamilla. After the State rested, the defendant's motion for a directed finding of acquittal was denied.

¶ 32    The defense proceeded to call Suzanne Perry, an analytic chemist, who was qualified as an expert in gas chromatography and forensic toxicology. She stated that she reviewed documents relating to auditing of the crime lab, the lab's protocols and procedures, and documents related to the testing of the DUI kit blood sample. She acknowledged that she had not reviewed records pertaining to the defendant's first blood draw.

¶ 33    Perry described the step-by-step procedures that, according to the International Organization for Standardization (ISO), should be taken in drawing blood to ensure accuracy in testing for alcohol levels. She also described the tubes used in such testing. She explained that the tube manufacturer adds specific amounts of potassium oxalate, to prevent clotting, as well as sodium fluoride, to inhibit fermentation of the blood sample. She stated that if a tube is underfilled with the blood sample, there will not be proper ratios of these chemicals, and they may not work properly. Perry also testified that refrigeration is "critical to maintaining the integrity" of the sample.

¶ 34    Perry also discussed an audit of the crime lab that was ongoing in 2011 when the defendant's blood was tested. She testified that the audit identified an "issue with the lab not reporting the measurement of uncertainty."

¶ 35    Perry also explained her doubts about the gas chromatography analysis performed on the DUI kit. She explained that the machine measures "electrical impulses" that are reflected by "peaks," but that a peak is not necessarily from alcohol. She opined that there "were several unidentified peaks" in the analysis of the DUI kit sample, which indicated that there were "unknown contaminants" that could have affected the results.

¶ 36    Perry opined that the lack of continuous refrigeration could have negatively impacted the accuracy of the blood analysis. She also opined that the tubes were "under filled," which caused her to believe that the tubes might not be sterile. Perry concluded that, due to factors including the "underfilling" of the tubes, the "lag time of refrigeration, the almost eight weeks to testing, and the lack of any measure of uncertainty, the proof that the method was validated, that the gas chromatology machine did not have contaminants," she believed the blood alcohol measurement from the DUI kit "could very well be incorrect." The defendant elected not to testify, and the defense presented no other witnesses.

¶ 37    Following closing arguments, the court announced its findings. The court specifically found that the traffic signals for westbound and eastbound traffic on Vollmer Road were

yellow at the time of the collision. The trial court emphasized Cardona's "very convincing" testimony that she observed that the Vollmer Road signals were yellow while she was waiting at the intersection, preparing to make a left-hand turn.

¶ 38    The court also noted that the defendant admitted to nurse Escamilla that he had been drinking, and that the initial blood draw indicated a 0.142 whole blood alcohol level. The court also cited the second blood draw for the DUI kit, indicating a blood alcohol level of 0.118. The court credited Paiva's expert opinion that the lack of refrigeration would not have affected the results. The court acknowledged Perry's criticisms of the crime lab. However, the court credited Paiva's testimony that the crime lab's methodology was "accepted within the scientific community."

¶ 39    The court also cited Coulom's diagram of the crash site as "very important," explaining:

> "Both vehicles stopped in the far right-hand lane of westbound traffic. That's quite a distance. *** This pickup truck is far into that intersection. ***
>
>     As I indicated I had made a determination that when the motorcycle entered or breached the intersection the light was yellow westbound. By the position of the defendant's pickup truck in this diagram and in the photographs, it certainly looks like he was executing a left-hand turn onto northbound Cicero. As such the defendant was required to yield to [the] motorcycle, that being oncoming traffic."

The court found that the defendant's failure to yield was the proximate cause of James McFall's death and Kasey McFall's injuries. Accordingly, the court found the defendant guilty of all 10 charged counts.

¶ 40    The defendant filed a posttrial motion, which was denied on January 13, 2017. On the same date, the court conducted a sentencing hearing. The court found that the conviction for aggravated DUI causing James McFall's death (count I) merged with counts II, III, and IV, and that the conviction for aggravated DUI causing Kasey McFall's bodily harm (count V) merged with the remaining counts. The court noted that the sentencing range for count I was 3 to 14 years; the range for count V was 1 to 12 years.

¶ 41    In sentencing the defendant, the court found as an aggravating factor that the defendant's "conduct caused or threatened serious harm." See 730 ILCS 5/5-5-3.2(a)(1) (West 2016). The court elaborated:

> "The fact that the accident, the crash *** caused serious harm to James McFall and Kasey McFall, I don't believe I can consider but it does apply here. Here's why: The vehicle that Mr. Turner was driving did not fall out of the sky and land at Vollmer and Cicero. He was driving to get there. He was driving before he got to that intersection and that driving threatened serious harm to people who were using that roadway prior to him getting to the intersection. I'm not speculating about that. There was traffic out there that night and the fact that he was driving in that impaired state threatened serious harm to other motorists. I'm not considering that regarding the death of James McFall in this case. I'm not considering that regarding the serious injuries that were sustained by Kasey in this case. However, I believe that aggravating factor does apply. Mr. Turner did not appear out of thin air. He drove to that intersection."

The trial court sentenced the defendant to two concurrent eight-year sentences on counts I and V. The defendant's motion *instanter*, to reconsider the sentence, was denied. On the same date,

January 13, 2017, the defendant filed a timely notice of appeal, affording this court jurisdiction.

¶ 42 On September 18, 2017, while this appeal was pending, the defendant filed a motion to stay his sentence and grant him bail under Illinois Supreme Court Rule 609(a) (eff. Feb. 6, 2013), "and/or to release appellant on electronic monitoring." In an order dated September 28, 2017, our court took that motion for consideration with the resolution of the case.

¶ 43                                    ANALYSIS

¶ 44 The defendant raises five distinct arguments on appeal: (1) the court erred in denying his pretrial motion to suppress the DUI kit blood draw, (2) the results of the first blood draw were inadmissible, (3) the evidence was insufficient to prove his guilt, (4) the court improperly limited Coulom's testimony, and (5) the trial court erred in applying an aggravating factor at sentencing.

¶ 45 We first address the argument that the trial court erred in denying the defendant's motion to suppress the DUI kit blood draw. The defendant argues that, because he did not consent and Officer Murphy did not attempt to obtain a warrant, the DUI kit blood draw violated his rights under the fourth amendment of the United States Constitution. The defendant acknowledges that the trial court relied on section 11-501.2(c) of the Code, which at the time of his arrest provided that "Notwithstanding any ability to refuse under this Code *** if a law enforcement officer has probable cause to believe that a motor vehicle driven by *** a person under the influence of alcohol *** has caused the death or personal injury to another, that person shall submit, upon the request of a law enforcement officer, to a chemical test or tests of his or her blood, breath or urine for the purpose of determining the alcohol content thereof ***." 625 ILCS 5/11-501.2(c)(2) (West 2010). The defendant argues that section 11-501.2(c) is unconstitutional in light of the United States Supreme Court decision of *Missouri v. McNeely*, 569 U.S. 141 (2013).

¶ 46 *McNeely* "considered whether the natural dissipation of alcohol in the bloodstream qualified as 'a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases.' " *People v. Harris*, 2015 IL App (4th) 140696, ¶ 47 (quoting *McNeely*, 569 U.S. at 145). *McNeely* held that "the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *McNeely*, 569 U.S. at 165. However, *McNeely* does not absolutely prohibit warrantless blood draws. Rather, "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *Id.* at 156.

¶ 47 The State asserts three arguments in response to the defendant's claim that *McNeely* invalidates the DUI kit blood draw in this case. The State first contends that the defendant consented to the blood draw. Second, the State argues that *McNeely* does not invalidate blood draws taken pursuant to section 11-501.2(c) of the Code. Thirdly, the State argues that, even assuming *arguendo* that *McNeely* invalidated section 11-501.2(c), the "good-faith exception" to the warrant requirement permitted the blood draw, given the case law that was binding precedent at the time of the defendant's arrest in 2011.

¶ 48 A two-part standard of review applies to the denial of a motion to suppress. *Harris*, 2015 IL App (4th) 140696, ¶ 44. "We give deference to a trial court's findings of fact, unless such

findings are against the manifest weight of the evidence. [Citation.] However, we review *de novo* the ultimate legal question of whether suppression of the evidence was required." *Id.*

¶ 49   Significantly, after the briefs were filed in this appeal, a separate panel of our court recently concluded that, in light of *McNeely*, section 11-501.2(c)(2) of the Code is unconstitutional. *People v. Eubanks*, 2017 IL App (1st) 142837. In *Eubanks*, the defendant was identified as the driver in a fatal hit-and-run accident. *Id.* ¶ 1. He was "placed in an interview room at 10:30 p.m., where he remained for the next 4½ hours." *Id.* ¶ 69. At 12 a.m., Eubanks was informed that he was under arrest for driving under the influence. *Id.* ¶ 67. The defendant refused to submit to blood and urine tests at the police station. *Id.* ¶ 7. At 2:53 a.m., a police officer transported the defendant to a hospital, telling him that he was required to submit to blood and urine tests. *Id.*

¶ 50   The parties stipulated that "Eubanks was physically restrained by hospital security and a blood sample was taken at 4 a.m." *Id.* Eubanks refused to provide a urine sample, but a sample was eventually collected after a "nurse threatened to catheterize him." *Id.* The defendant's urine tested positive for cannabis, ecstasy, and cocaine metabolite. *Id.*

¶ 51   In a pretrial motion to suppress the test results, Eubanks argued that there was no exigency excusing the police officers' failure to obtain a warrant, and he asserted that section 11-501.2(c)(2) of the Code was unconstitutional. *Id.* ¶ 6. After his motion to suppress was denied, Eubanks was convicted by a jury of charges including aggravated DUI and murder. *Id.* ¶ 27.

¶ 52   On appeal, our court held that "under *McNeely*, section 11-501.2(c)(2) is unconstitutional on its face, insofar as it permits compelled chemical testing without a warrant in all cases where an officer has probable cause to believe that a driver under the influence has caused death or personal injury to another." *Id.* ¶ 66. We recognized that "some such cases will involve exigencies, but when such cases arise, the State can and should prove the existence of an exigency on a case-by-case basis rather than relying upon the 'considerable overgeneralization' [citation] engendered by the current statute." *Id.* Our court noted that the factual record in *Eubanks* "d[id] not reflect any exigency that would have prevented officers from obtaining a warrant" during the several hours that Eubanks was in custody before the blood and urine samples were collected. *Id.* ¶ 67.

¶ 53   Our court in *Eubanks* also rejected the State's alternative argument that, even if section 11-501.2(c)(2) was unconstitutional, admission of the blood and urine samples was proper because the "officers took the samples in good faith reliance on Illinois law." *Id.* ¶ 70. As Eubanks was arrested in 2009, before *McNeely*, the State argued that "the arresting officers were entitled to rely on our supreme court's 2005 decision" in *People v. Jones*, 214 Ill. 2d 187 (2005). *Eubanks*, 2017 IL App (1st) 142837, ¶ 70. In *Jones*, our supreme court held that section 11-501.2(c)(2) of the Code did not confer a statutory right to refuse a blood draw in DUI cases not involving death or injury, and thus held that blood and urine tests "performed over defendant's objection" should not have been suppressed. *Jones*, 214 Ill. 2d at 202.

¶ 54   In *Eubanks*, we recognized that " '[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.' " *Eubanks*, 2017 IL App (1st) 142837, ¶ 71 (quoting *Davis v. United States*, 564 U.S. 229, 241 (2011)). Nevertheless, we rejected the State's reliance on *Jones*, noting that the defendant in *Jones* "verbally refused to give blood and urine samples but did not physically resist their collection." *Id.* ¶ 72. Further, we emphasized our supreme court's statement in *Jones* that " 'We do not

- 9 -

suggest that a DUI arrestee's lack of a right to refuse chemical testing \*\*\* permits law enforcement officers to use physical force in obtaining blood, urine, and breath samples.' " *Id.* (quoting *Jones*, 214 Ill. 2d at 201). Because there was "no question that physical force was used" to obtain the blood and urine samples from Eubanks, we found that his arresting officers "could not have reasonably relied on *Jones* to authorize such conduct." *Id.* Thus, our court concluded that the good-faith exception did not apply, and Eubanks's test results should have been suppressed. *Id.* ¶ 74.

¶ 55    *Eubanks*'s holding that section 11-501.2(c)(2) is unconstitutional on its face does not end our analysis of the DUI kit in this case, since the State argues for application of the good-faith exception to the warrant requirement. If that exception applies, it will support admission of the DUI kit blood draw, notwithstanding section 11-501.2(c)(2)'s unconstitutionality.

¶ 56    "There is no constitutional right to have the evidence resulting from an illegal search or seizure suppressed at trial. [Citation.] The mere fact of a fourth amendment violation does not mean that exclusion necessarily follows." *People v. LeFlore*, 2015 IL 116799, ¶ 22. Evidence will not be excluded where police acted with an "objectively reasonable good-faith belief that their conduct [was] lawful" as in such cases "there is no illicit conduct to deter." (Internal quotation marks omitted.) *Id.* ¶ 24. Accordingly, under the good-faith exception, "searches conducted [by police] in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 564 U.S at 232. In determining whether the exception applies, a court asks "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." (Internal quotation marks omitted.) *LeFlore*, 2015 IL 116799, ¶ 25.

¶ 57    In a factually analogous case, the Fifth District of our court held that the good-faith exception permitted admission of a DUI blood draw taken in 2011, notwithstanding the subsequent *McNeely* decision. *People v. Harrison*, 2016 IL App (5th) 150048. The *Harrison* defendant drove a truck that collided with a motorcycle, resulting in serious injury. *Id.* ¶ 4. A responding police officer (Branchini) arrested the defendant after he failed field sobriety tests. *Id.* ¶ 5. Blood samples were drawn, notwithstanding that "the defendant did not agree to the procedure." *Id.* ¶ 7.

¶ 58    The defendant moved to suppress the blood test results, arguing that there were no exigent circumstances to justify a nonconsensual, warrantless search. *Id.* ¶ 8. The trial court denied the motion, reasoning that even if section 11-501.2(c)(2) of the Code was unconstitutional, the arresting officer "acted in good-faith reliance on prior precedent upholding its validity." *Id.* ¶ 10.

¶ 59    The Fifth District of our court considered whether the officer "acted in good-faith reliance on binding precedent" at the time of the 2011 arrest. *Id.* ¶ 14. The court in *Harrison* recognized that a 1975 decision of our supreme court stated that " 'a compulsory blood test does not violate any constitutional rights of an individual merely because he objected to such tests.' " *Id.* ¶ 22 (quoting *People v. Todd*, 59 Ill. 2d 534, 544-45 (1975)). *Harrison* further recognized that subsequent decisions of the appellate court "consistently upheld the constitutional validity of warrantless, nonconsensual blood draws such as the one administered in the present case." *Id.* ¶ 23.

¶ 60    *Harrison* also relied heavily on our supreme court's 2005 decision in *Jones*, 214 Ill. 2d 187, which held that results of blood and urine tests were admissible even if the tests were

"performed over defendant's objection." *Id.* at 202. The Fifth District concluded that *Jones* supported application of the good-faith exception:

> "[W]hen Branchini arrested the defendant in March 2011, *McNeely* had yet to be decided, and *Jones* was binding precedent holding that not only did section 11-501.2(c)(2) 'clearly' allow for warrantless, nonconsensual blood draws in DUI cases involving the death or personal injury to another, it allowed for such draws in all DUI cases. [Citation.] Thus, Branchini could have reasonably relied on *Jones* as binding precedent authorizing the taking of the defendant's blood pursuant to section 11-501.2(c)(2). Accordingly, *** the trial court properly determined that the good-faith exception to the exclusionary rule was applicable under the circumstances." *Harrison*, 2016 IL App (5th) 150048, ¶ 25.

¶ 61    We find that *Harrison* supports application of the good-faith exception under the facts of this case. As in *Harrison*, the defendant's arrest in this case occurred after our supreme court's decision in *Jones* but before the 2013 decision in *McNeely*. Thus, Officer Murphy could reasonably rely on *Jones* for the proposition that warrantless blood draws are permitted in DUI cases, even where the defendant objected to the blood draw. See *id.*

¶ 62    We recognize that our recent opinion in *Eubanks* rejected the State's reliance on *Jones* to invoke the good-faith exception. *Eubanks*, 2017 IL App (1st) 142837, ¶ 72. However, our conclusion in this case is not inconsistent, as *Eubanks* is clearly distinguishable under its particular facts. The defendant in *Eubanks* did not merely decline to consent to the tests; rather, our court emphasized that "physical force was used to obtain Eubanks's blood and urine samples," including that he was "handcuffed to the hospital bed while blood was forcibly drawn from him." *Id.* Since our supreme court in *Jones* expressly cautioned that it did *not* "permit[ ] law enforcement officers to use physical force in obtaining blood, urine, and breath samples" (*Jones*, 214 Ill. 2d at 201), we concluded that the officers in *Eubanks* "could not have reasonably relied on *Jones* to authorize such conduct." *Eubanks*, 2017 IL App (1st) 142837, ¶ 72.

¶ 63    The facts of the present case are plainly distinguishable from *Eubanks*. Although the defendant in this case testified that he initially refused requests for a blood draw, he did not claim (and there is nothing in the record to suggest) that he was physically threatened or restrained in order to obtain the sample. The trial court specifically found that he was not coerced, and that finding is not against the manifest weight of the evidence. In this sense, the circumstances of the defendant's DUI blood draw are much more similar to *Harrison* than to *Eubanks*. Thus, as in *Harrison*, we conclude that at the time of this occurrence, Officer Murphy could reasonably have relied on our supreme court's decision in *Jones* to request the blood draw. As the good-faith exception applies in this case, we affirm the denial of the motion to suppress the DUI kit blood draw.

¶ 64    We next address the defendant's separate claim that the evidence of the *first* blood draw should not have been admitted because "the Illinois Rules of Evidence exclude medical records from the business records exception to the hearsay rule."[1] We note that a trial court's

---

[1] The parties dispute whether the defendant's trial counsel adequately preserved this claim. However, even if forfeited, the issue would be subject to review under plain error, and the first step of plain-error analysis is whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). For the reasons stated herein, we find there was no error.

ruling on the admissibility of evidence is reviewed for an abuse of discretion. *People v. Hutchison*, 2013 IL App (1st) 102332, ¶ 14. The defendant's argument also raises a question of statutory construction, which is reviewed *de novo*. *Id.*

¶ 65    The defendant relies on Illinois Rule of Evidence 803(6), which provides that records of "regularly conducted activity" are not inadmissible hearsay where they constitute:

> "A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, *but not including in criminal cases medical records.*" (Emphasis added.) Ill. R. Evid. 803(6) (eff. Jan. 1, 2011).

¶ 66    The defendant argues that the last clause of Rule 803(6) supersedes section 11-501.4 of the Code, which provides:

> "(a) Notwithstanding any other provision of law, the results of blood or urine tests performed for the purpose of determining the content of alcohol *** of an individual's blood or urine conducted upon persons receiving medical treatment in a hospital emergency room are admissible in evidence as a business record exception to the hearsay rule only in prosecutions for any violation of Section 11-501 of this Code *** when each of the following criteria are met:
>
> > (1) the chemical tests performed upon an individual's blood or urine were ordered in the regular course of providing emergency medical treatment and not at the request of law enforcement authorities;
> >
> > (2) the chemical tests performed upon an individual's blood or urine were performed by the laboratory routinely used by the hospital; and
> >
> > (3) results of chemical tests performed upon an individual's blood or urine are admissible into evidence regardless of the time that the records were prepared." 625 ILCS 5/11-501.4 (West 2010).

¶ 67    The defendant does not dispute that the first blood draw meets the factual prerequisites for admissibility under section 11-501.4 of the Code. Nevertheless, the defendant contends that section 11-501.4 conflicts with, and was superseded by, the language of Illinois Rule of Evidence 803(6) regarding medical records in criminal cases.

¶ 68    This court considered the same argument in *Hutchison*, 2013 IL App (1st) 102332, in which we explained: "We also reject defendant's claim *** that section 11-501.4 and the case law interpreting it does not survive the subsequent enactment of the Illinois Rules of Evidence, specifically Illinois Rule of Evidence 803(6) (eff. Jan. 1, 2011). This argument mischaracterizes the purpose and effect of the enactment of the Illinois Rules of Evidence ***. With certain exceptions not relevant here, the enactment of the Illinois Rules of Evidence accomplished a codification of existing Illinois law." *Id.* ¶ 24. Our court in *Hutchison* recited the committee comments accompanying the Illinois Rules of Evidence, which state:

> " 'It is important to note that the Illinois Rules of Evidence are not intended to abrogate or supersede any current statutory rules of evidence. The Committee sought to

avoid in all instances affecting the validity of any existing statutes promulgated by the Illinois legislature.' " *Id.* (quoting Ill. R. Evid., Committee Commentary).

Thus, in *Hutchison* we found that "section 11-501.4 survives the enactment of the Illinois Rules of Evidence and is not affected or modified thereby." *Id.*

¶ 69    The defendant urges that *Hutchison* was wrongly decided. The defendant's reply brief asserts that the recent decision of *People v. Peterson*, 2017 IL 120331 (filed since the defendant's initial appellate brief) is directly on point and "supersedes or overrules *Hutchison.*"

¶ 70    In relevant part, *Peterson* discussed the admissibility of statements in which the defendant's alleged murder victim told others about the defendant's threats to kill her. *Id.* ¶¶ 14-16. At trial, the State sought admission of the statements under section 115-10.6 of the Code of Criminal Procedure of 1963, which codified a hearsay exception permitting admission of a statement " 'offered against a party that has killed the declarant.' " *Id.* ¶ 17 (quoting 725 ILCS 5/115-10.6(a) (West 2008)). Among other requirements, that provision allowed admission of such statements only if the court found that "the adverse party murdered the declarant and that the murder was intended to cause the unavailability of the declarant as a witness," and that the circumstances of the statements "provide[d] sufficient safeguards of reliability." 725 ILCS 5/115-10.6(e)(2) (West 2008).

¶ 71    The supreme court in *Peterson* recognized that "where an irreconcilable conflict exists between a legislative enactment and a rule of [the supreme] court on a matter within the court's authority, the rule will prevail." *Peterson*, 2017 IL 120331, ¶ 31. Our supreme court found that the statute's requirements conflicted with Illinois Rule of Evidence 804(b)(5), which allows "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). Because the "statute's imposition of a reliability requirement creates an irreconcilable conflict with a rule of this court," "separation of powers principles dictate[d] that the rule will prevail." *Peterson*, 2017 IL 120331, ¶ 34. Thus, the admissibility of the statements was governed by the Illinois Rules of Evidence, not by the statute. *Id.*

¶ 72    We are not persuaded that *Peterson* alters the conclusion reached in *Hutchison*—that section 11-501.4 remains valid after the 2011 Illinois Rules of Evidence. *Peterson* recognizes that an "irreconcilable conflict" will result in the Illinois Rules of Evidence taking precedence over a statutory provision. *Id.* ¶ 31. However, we cannot find an irreconcilable conflict between section 11-501.4 of the Code and the Illinois Rules of Evidence, particularly in light of the committee commentary relied upon by *Hutchison*, which explicitly refutes the suggestion that section 11-501.4 was abrogated or superseded by the enactment of the Illinois Rules of Evidence. *Hutchison*, 2013 IL App (1st) 102332, ¶ 24. The defendant fails to address this commentary. As we find no reason to depart from our reasoning in *Hutchison*, we reject the defendant's challenge to the admissibility of the first blood draw.

¶ 73    We next address the defendant's claim that the evidence was insufficient to convict him. He posits "two major reasons" for this assertion. First, he claims that the eyewitness testimony "support[s] a reasonable doubt that Simuel Turner's alleged intoxication was the proximate cause of the accident." Specifically, he argues that the trial court improperly "ignored and minimized" the testimony of Respress. He argues that "Given these facts: (1) that the motorcycle was travelling more than twice as fast as Turner's truck, (2) was accelerating through a light which had already turned yellow when the motorcycle changed lanes, (3)

entered the intersection at an angle, (4) was shaking back and forth, (5) struck the truck, not the other way around, and (6) struck the truck as the light was turning from yellow to red, there is more than a reasonable doubt that Turner's alleged intoxication prevented him from perceiving the motorcycle ***." He further claims that the trial court's reliance on Cardona's recollection was "misplaced" as her testimony "was highly suspect." Separately, the defendant contends that Perry's expert testimony "established a reasonable doubt as to the accuracy" of the testing of the DUI kit.

¶ 74    "When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This court "may not substitute our judgment for the trier of fact's regarding the weight of the evidence or the credibility of the witnesses." *People v. Ivy*, 2015 IL App (1st) 130045, ¶ 56. "A conviction should not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that a reasonable doubt exists about the defendant's guilt." *People v. Perez*, 189 Ill. 2d 254, 266 (2000).

¶ 75    We first ascertain the proof necessary to support the aggravated DUI charges at issue. As explained by our supreme court, "aggravated DUI is simply misdemeanor DUI with an aggravating factor, which turns the offense into a felony." *People v. Martin*, 2011 IL 109102, ¶ 24. Section 11-501(a) of the Code describes the acts constituting the misdemeanor DUI offense. 625 ILCS 5/11-501(a) (West 2010). Relevant to this case, subsection (a)(1) specifies a violation if a person drives with a blood alcohol concentration of 0.08 or more. *Id.* § 11-501(a)(1). Our supreme court recognized that this subsection is a " 'strict liability' " offense because it does not require proof of actual impairment from consumption of drugs or alcohol. *Martin*, 2011 IL 109102, ¶ 26 (explaining that, under section 11-501(a), "a driver may commit misdemeanor DUI in six ways," four of which require proof of impairment, whereas subparts (a)(1) and (a)(6) are " 'strict liability' " violations).

¶ 76    Section 11-501(d) sets forth the factors that elevate a violation of section 11-501(a) to aggravated DUI. 625 ILCS 5/11-501(d) (West 2010). Relevant to count I of this case, aggravated DUI occurs under subsection 11-501(d)(1)(F) where a person is "involved in a motor vehicle *** accident that resulted in the death of another person, when the [defendant's] violation of subsection (a) was a proximate cause of the death." *Id.* § 11-501(d)(1)(F). Relevant to count V, section 11-501(d)(1)(C) applies where a motor vehicle accident results in "great bodily harm or permanent disability or disfigurement to another, when the [defendant's] violation [of subsection (a)] was a proximate cause of the injuries." *Id.* § 11-501(d)(1)(C).

¶ 77    Our supreme court has held that the "proximate cause" requirement of aggravated DUI requires only a causal link between the physical act of driving and the death, if the charge is premised on one of the two "strict liability" forms of misdemeanor DUI under section 11-501(a). *Martin*, 2011 IL 109102. The *Martin* defendant was charged with aggravated DUI under section 11-501(d)(1)(F). The underlying misdemeanor DUI was based on section 11-501(a)(6), which prohibits a person from driving with "any amount" of methamphetamine in one's body. 625 ILCS 5/11-501(a)(6) (West 2010). Our supreme court considered "whether the proximate cause requirement of section 11-501(d)(1)(F) means that the State must prove the defendant's drug use, rather than his driving, caused the deaths." *Martin*, 2011 IL 109102, ¶ 20. Our supreme court reasoned that since the underlying misdemeanor was a " 'strict

- 14 -

liability' " offense for driving with any amount of methamphetamine in the body, the proximate cause element of the aggravated DUI offense required only a causal link between the defendant's driving and another person's death. *Id.* ¶ 26.

¶ 78        Applying *Martin*, our court has held that when an aggravated DUI charge under section 11-501(d)(1)(F) is premised on a violation of section 11-501(a)(1) for driving with blood alcohol content over 0.08, the "proximate cause" element of the aggravated offense requires only that the death was caused by the defendant's driving. *People v. Merrick*, 2012 IL App (3d) 100551, ¶¶ 25-27 (rejecting the defendant's argument that there was "insufficient proof that his alcohol consumption was the proximate cause of the motor vehicle accident"); *People v. Ikerman*, 2012 IL App (5th) 110299, ¶ 50 ("proximate cause requires the State to show a causal link between the physical act of driving and another person's death"). Thus, to support count I, the State needed to prove that the defendant was driving with a blood alcohol level over 0.08, and that his driving was the proximate cause of James McFall's death. Count V similarly required the State to prove that the defendant's driving caused Kasey McFall's injuries.

¶ 79        With these principles in mind, we must reject the defendant's argument that the State could not prove proximate cause. There are multiple flaws with the defendant's argument. First, the defendant essentially asks that we reweigh the evidence, urging that Respress's testimony was entitled to greater weight. However, "we will not substitute our judgment for that of the trier of fact on questions concerning the weight of the evidence or the credibility of the witnesses." *People v. Jones*, 2015 IL App (1st) 142597, ¶ 20. Second, the defendant suggests that the State was required to prove that the defendant's "intoxication" was a proximate cause of the accident. This is incorrect, as the aggravated DUI charges were premised on a violation of section 11-501(a)(1), which imposes strict liability for driving with a blood alcohol content over 0.08. The aggravated DUI offense thus only required that the defendant's *act of driving* proximately caused death or bodily harm. See *Merrick*, 2012 IL App (3d) 100551, ¶ 27.

¶ 80        Viewing the evidence in the light most favorable to the State, the court could find beyond a reasonable doubt that the defendant's driving proximately caused James McFall's death and Kasey McFall's injuries. Multiple eyewitnesses testified that the defendant attempted a left-hand turn during a yellow light, while the motorcycle approached from the opposite direction. Thus, the court could conclude from the evidence that the defendant's failure to yield proximately caused the collision.

¶ 81        We also reject the defendant's contention that Perry's testimony precluded a finding that his blood alcohol level exceeded the legal limit. There are multiple problems with defendant's argument on this point. First, Perry's testimony only concerned the second blood draw taken for the defendant's DUI kit. Perry did not dispute the initial emergency room blood draw that indicated a blood alcohol level of 0.142. Thus, regardless of Perry's criticism of the DUI kit, the trial court could have relied on the first blood draw as proof of the defendant's blood alcohol content. Moreover, the trial court was not required to accept Perry's criticisms of the crime lab's methodology, but could credit the conflicting expert testimony from the State's expert, Paiva. See *People v. Peterson*, 171 Ill. App. 3d 730, 734 (1988). Thus, Perry's testimony did not preclude the State from proving the defendant's guilt.

¶ 82        We next address the defendant's claim that a new trial is warranted because the court prevented the State's accident reconstruction expert, Coulom, from testifying as to the color of the traffic lights or opining as to who was at fault for the collision. "A circuit court's evidentiary rulings regarding the admissibility of testimony *** are within its sound discretion

- 15 -

and this court will not reverse such rulings unless the circuit court abused its discretion. [Citation.] A circuit court abuses its discretion when its ruling 'is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' [Citation.]" *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23.

¶ 83    "For expert testimony to be admissible, an adequate foundation must be laid establishing that the information that the expert bases the opinion upon is reliable. [Citation.] Expert testimony is admissible if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education and the testimony will assist the trier of fact in understanding the evidence." (Internal quotation marks omitted.) *Id.* ¶ 32.

¶ 84    We cannot say that the trial court abused its discretion in limiting Coulom's testimony. With respect to the color of the traffic lights, the court elected to rely on the eyewitnesses' trial testimony, rather than Coulom. That decision was reasonable, especially since Coulom never testified to any technical expertise on that issue. To the contrary, he indicated that he relied on other witnesses as to the color of the traffic lights.

¶ 85    Similarly, the trial court did not abuse its discretion in precluding defense counsel from eliciting Coulom's opinion about "fault." We recognize that an expert opinion is not objectionable merely "because it embraces an ultimate issue to be decided by the trier of fact." Ill. R. Evid. 704 (eff. Jan. 1, 2011). Yet the trial court maintains discretion to preclude an opinion that it does not believe will be helpful. In this case, the trial court could reasonably conclude that Coulom's opinion on "fault" would not be helpful, as he had already stated his conclusions as to the speed and relative positions of the vehicles, and his opinion that they arrived at the point of impact "about the same time." Moreover, the question of "fault" in this case was closely related to the factual question of the color of the traffic signals. As already discussed, the court reasonably relied on the eyewitnesses to decide that question. As the trier of fact, this was squarely within the court's discretion. Thus, we find no abuse of discretion in the court's rulings on Coulom's testimony.

¶ 86    Finally, we address the defendant's argument that the court erred at sentencing when it applied the statutory aggravating factor that "the defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2016). The defendant claims that this was an impermissible "double enhancement" based on an element of the offense. He argues that "[s]ince driving a car while having a blood alcohol [level] of .08 or more is an element of the offense, the trial judge's consideration of the harm threatened by this conduct" cannot serve as an aggravating factor.

¶ 87    "Generally, a circuit court may not use a factor implicit in the offense for which the defendant was convicted as an aggravating factor at sentencing for that offense. [Citation.] Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing 'a harsher sentence than might otherwise have been imposed.' [Citation.] Dual use of a single factor is referred to as a 'double enhancement.' [Citation.] The double-enhancement rule is one of statutory construction and the standard of review is *de novo*." *People v. Morris*, 2014 IL App (1st) 130152, ¶ 51. "However, there is a strong presumption that the trial court based its sentencing determination on proper legal reasoning ***." *People v Dowding*, 388 Ill. App. 3d 936, 942-43 (2009).

¶ 88    The trial court may consider as an aggravating factor "the *manner* in which the victim's death was brought about, as well as the *seriousness, nature*, and *circumstances* of the offense ***. However, the trial court may *not* consider the end result—*i.e.*, the victim's death—as a

factor in aggravation where death is implicit in the offense." (Emphases in original.) *Id.* at 943-44 (circuit court erred in sentencing defendant for aggravated DUI where it "expressly stated that causing the victim's death was an aggravating factor upon which the sentence was based").

¶ 89      Our review of the entire record convinces us that the court did not impose an improper double enhancement. The trial court in this case explicitly recognized and stated that it could *not* consider James McFall's death, or the injuries to Kasey McFall, as aggravating factors. As the court took the time to make that statement, we must assume that it acted accordingly. Rather, the trial court emphasized the threat posed to *other* motorists by the defendant's driving. The defendant suggests that the court could not consider potential harm to others, based upon the act of his driving with a blood alcohol level above 0.08 being inherently dangerous. However, the court could still consider the severity of the risk under the particular facts of this case, including the proximity of the defendant's conduct to potential victims *other* than James and Kasey McFall. In this case, the State's evidence demonstrated that other motorists were in close proximity to the defendant and the accident, supporting a finding that the defendant's conduct "threatened serious harm." Thus, we will not disturb the defendant's sentence.

¶ 90      Finally, we note that, as we affirm the defendant's conviction and sentence, we also deny his motion filed during the pendency of the appeal, to be granted bail or electronic monitoring.

¶ 91      For the foregoing reasons, we affirm the circuit court of Cook County.

¶ 92      Affirmed; motion denied.