# Illinois Official Reports

## Appellate Court

---

### *People v. Cross*, 2021 IL App (1st) 190374

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TAQUELL CROSS, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>No. 1-19-0374 |
| Filed | June 18, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-CR-273901; the Hon. Vincent Gaughan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Adam R. Vaught, of Hinshaw & Culbertson LLP, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon J. Walters, and David B. Greenspan, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Presiding Justice Delort and Justice Hoffman concurred in the judgment and opinion. |

¶ 1    The defendant-appellant, Taquell Cross, appeals his conviction for residential burglary, for which he was sentenced to eight years' imprisonment. On appeal, the defendant argues that it was plain error to admit testimony that his fingerprint was found at the scene of the burglary where the fingerprint examiner did not specifically testify that he completed all necessary steps for verifying the defendant's fingerprint. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 2                                                    BACKGROUND

¶ 3    Bimbi Munoz and Jesus De Los Santos lived with their son and Mr. De Los Santos' brother at 5326 West Newport Avenue in Chicago. On November 27, 2017, while they were out, their home was burglarized. Upon their return, they discovered the door to their home ajar and the home in disarray. When police arrived, and they entered the home, the family noticed that several of their possessions were missing, including an air conditioning unit, firearms, ammunition, a MacBook computer, an iPhone, and an Xbox video game console. Ms. Munoz's wallet was also emptied of its contents. A television set, which had been moved from the bedroom to the kitchen, was dusted for fingerprints, and Ms. Munoz and Mr. De Los Santos' fingerprints were also taken for comparison and elimination.

¶ 4    Chicago police detective Daniel Dennewitz examined a fingerprint recovered from the home and discovered that it belonged to the defendant, Taquell Cross.

¶ 5    An investigative alert was issued, and on January 26, 2018, the defendant was in custody. Detectives questioned the defendant about the burglary at the Munoz/De Los Santos home. Upon questioning, the defendant confessed and was charged with residential burglary.

¶ 6    A jury trial commenced on December 6, 2018. At trial, Detective Dennewitz was admitted as an expert on latent fingerprint examination after extensive *voir dire*. Detective Dennewitz began his testimony by describing latent fingerprints and fingerprints generally. The detective explained that latent fingerprints are those that are "hidden" and require development by crime scene professionals. Detective Dennewitz further explained that fingerprints are permanent and unique with friction ridge patterns consisting of raised ridges and deep valleys. Fingerprints have three levels of detail. The first level is the ridge paths and "how they flow across the skin." This level is similar among all humans. Level two is where the ridges stop and start or bifurcate, which is more unique to individuals. Level three is the size of the ridge paths and the edges in the ridge paths.

¶ 7    When examining a fingerprint, Detective Dennewitz testified that he uses the "ACE-V" methodology. ACE-V is an acronym for analyze, compare, evaluate, and verify. At the analysis stage, the examiner thoroughly analyzes the friction ridge impression and determines whether the fingerprint has value. Assuming a determination of value is reached, the next step is to compare the latent fingerprint to known fingerprints. The initial comparison is done against "elimination prints," which are taken from individuals, *i.e.* the victims, who have access to the crime scene. If the victims can be eliminated as the source of the latent fingerprints, the examiner compares the latent fingerprint to other known fingerprints. If a comparison results in an identification with another known fingerprint, meaning that the latent and the known fingerprints share the same level two or level three detail, then the examiner takes the third

step of reevaluating the two fingerprints. Finally, the examiner has the results verified by another examiner.

¶ 8    With regard to the fingerprint recovered at the crime scene in this case, Detective Dennewitz testified that he first analyzed the fingerprint and determined that it was suitable for comparison. Next, he compared the latent fingerprint to the fingerprint of Mr. De Los Santos and determined that the latent fingerprint did not belong to Mr. De Los Santos. Because there were no suspects for him to compare the latent fingerprint to, he turned to the Automated Fingerprint Identification System database (AFIS database). The AFIS database is a software tool that enables users to enter the latent fingerprint and retrieve fingerprints stored in the system from candidates that may match the latent fingerprint. Detective Dennewitz testified that the defendant's fingerprints were retrieved from the database as a possible match. Detective Dennewitz subsequently concluded that the defendant's left middle fingerprint matched the latent fingerprint recovered from the crime scene. He prepared a report indicating his conclusion. Detective Dennewitz concluded by testifying that he followed "proper procedures and methodology" in conducting his exam and comparison.

¶ 9    Detective Bilos Thomas, a Chicago police officer for 19 years, testified regarding the defendant's confession. Detective Thomas testified that he was assigned to investigate the burglary in this case. As part of his investigation, he asked that the latent fingerprint recovered from the television set at the crime scene be processed. On December 15, 2017, Detective Thomas received Detective Dennewitz's report of the fingerprint examination, which identified the defendant as a match for the latent fingerprint. Detective Thomas printed a photo of the defendant from the Chicago Police Department central booking division. He later showed the photo to the victims of the burglary. None of the victims recognized the defendant or had given him permission to enter their residence.

¶ 10    On January 26, 2018, Detective Thomas interviewed the defendant with Detective Joe Morgan. Detective Thomas took the defendant to an interview room that had recording equipment, but the equipment was not turned on. Detective Thomas testified that they needed the defendant's consent to record the interview. After taking the defendant to the interview room, Detective Thomas read the defendant his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). The defendant stated that he understood his rights and agreed to speak with the detectives.

¶ 11    The detective began by telling the defendant that his fingerprints were found in a house that was burglarized. Initially, the defendant denied knowing about the burglary, but when Detective Thomas told him the house had guns, the defendant admitted that he was familiar with the house in question. The defendant then told the detectives that on November 27, 2017, his friend Enrique Rosa picked him up and the two drove around a neighborhood. Mr. Rosa would stop the car and knock on doors to see if anyone was home. Eventually, Mr. Rosa and the defendant reached the victim's house, which they entered by removing the window air conditioning unit. The defendant admitted to taking cell phones, a MacBook computer, a shotgun, and a rifle from the house. The defendant said that he sold the rifle to Christopher Medina and Mr. Rosa kept the shotgun. The defendant also admitted to selling the remaining electronics. When Detective Thomas asked the defendant why only his fingerprints were recovered from the scene, the defendant stated that Mr. Rosa was wearing gloves.

¶ 12    On cross-examination, Detective Thomas stated that he did not ask for the defendant's permission to record the interview because he believed the defendant would not be comfortable

with that. He further testified that he had not been trained in taking handwritten statements and did not take the defendant's handwritten statement corroborating his verbal confession. Detective Thomas testified that he did not attempt to contact Mr. Rosa and that he abandoned any investigation into Mr. Medina (the person to whom the defendant claimed to have sold the rifle) after a phone call did not yield useful information.

¶ 13       Detective Morgan's testimony corroborated that of Detective Thomas regarding the interview of the defendant.

¶ 14       The defendant's motion for a directed verdict was denied, and he rested his case without putting on any evidence. The jury found the defendant guilty of residential burglary.

¶ 15       In January 2019, the defendant's motion for a new trial was denied, and the defendant was sentenced to eight years' imprisonment. His motion to reconsider sentence was denied, and the defendant filed a notice of appeal the same day.

¶ 16                                                        ANALYSIS

¶ 17       We note that we have jurisdiction to review this matter, as the defendant timely appealed. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017).

¶ 18       The defendant challenges his conviction on the basis that the court erroneously admitted Detective Dennewitz's testimony where the detective did not testify that he performed the verification required under the ACE-V methodology. At the outset, we note that the defendant failed to object to Detective Dennewitz's testimony at trial or in a posttrial motion, thereby forfeiting this argument for review. See *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) (failure to object to an error at trial and allege error in posttrial motion forfeits appellate review of error). However, the plain error doctrine allows us to consider an unpreserved issue in two circumstances: (1) where a clear and obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) where a clear and obvious error occurred and the error itself is so serious that it affected the integrity of the trial, regardless of the closeness of the evidence. *People v. Harvey*, 2018 IL 122325, ¶ 15. The first step in plain error review is always to determine whether an error occurred. *Id.*

¶ 19       In support of its position that the trial court erred in admitting Detective Dennewitz's testimony, the defendant relies on *People v. Cline*, 2020 IL App (1st) 172631. In that case, this court reversed the defendant's conviction for burglary based solely on fingerprint evidence, where Detective Dennewitz (the same detective involved in this case) failed to testify that an independent examiner verified his identification of the defendant's fingerprint. *Id.* ¶ 28. The court in *Cline* ruled that Detective Dennewitz's "flawed" examination of a single fingerprint was insufficient to convict the defendant of residential burglary, where no other evidence linked the defendant to the crime scene. *Id.* ¶¶ 17, 28.

¶ 20       In contrast to *Cline*, the defendant here does not challenge the sufficiency of the evidence.[1] Instead, he argues that Detective Dennewitz's testimony was *inadmissible* because of the detective's failure to testify that an independent examiner verified his conclusion that the latent fingerprint recovered from the scene belonged to the defendant. We review the admission of

_____

[1]Also, unlike *Cline*, the defendant's conviction in this case did not rest solely on fingerprint evidence, but also on his detailed confession.

- 4 -

evidence for an abuse of discretion. *People v. Turner*, 2018 IL App (1st) 170204, ¶ 64. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable. *People v. Fredericks*, 2014 IL App (1st) 122122, ¶ 39.

¶ 21    In this case, Detective Dennewitz described in detail the ACE-V methodology and further testified that he followed that methodology in evaluating the latent fingerprint recovered in this case. To be sure, Detective Dennewitz did not provide explicit testimony regarding his performance of the verification step, in contrast to his detailed testimony on the analysis, comparison, and evaluation steps. But issues regarding an expert's application of generally-accepted techniques go to the *weight* of the evidence, rather than its admissibility. *People v. Luna*, 2013 IL App (1st) 072253, ¶ 70 (citing *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 81 (2002), *abrogated on other grounds by In re Commitment of Simons*, 213 Ill. 2d 523 (2004)). In the case before us, given the detailed description of the ACE-V process by Detective Dennewitz, the absence of explicit testimony regarding verification by another examiner was for the jury to consider in determining the weight to accord Detective Dennewitz's identification. Therefore, it was not error for the court to admit the detective's testimony and allow the jury to determine its significance.

¶ 22    Because we conclude that no error occurred, we need not engage in plain error review.

¶ 23                                    CONCLUSION

¶ 24    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 25    Affirmed.