2025 IL App (1st) 231795

FIRST DISTRICT
SECOND DIVISION
November 12, 2025

No. 1-23-1795

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19CR3535 |
| | ) | |
| DEANDRE REDMOND, | ) | Honorable |
| | ) | Michele Pitman, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice D.B. Walker concurred in the judgment and opinion.

## OPINION

¶ 1 Following a jury trial, defendant Deandre Redmond was convicted of second degree murder and armed violence. The trial court subsequently sentenced him to 22 years in prison. On appeal, defendant argues that (1) the armed violence statute (720 ILCS 5/33A-2(a) (West 2018)) violates the second amendment of the United States Constitution (U.S. Const., amend. II), both on its face and as applied to him; (2) the trial court erred in allowing the prosecutor and witnesses for the State to refer to the decedent as the "victim"; and (3) the trial court erred in denying defendant's request for the duty to retreat instruction in a self-defense case.

¶ 2 Defendant was charged by indictment with first degree murder in the February 2019 shooting death of J'Vonte Gibson, as well as armed violence, alleging that while armed with a dangerous weapon, defendant committed a felony—specifically, the possession of cannabis with intent to deliver.

¶ 3     The events leading to Gibson's death occurred at the state boundary line between Illinois and Indiana. Police officers from both Calumet City, Illinois, and Hammond, Indiana, investigated the case and testified at trial. The following evidence was presented at defendant's April 2023 jury trial.

¶ 4     On February 19, 2019, Louann Dietz was working as the day manager at State Line Pizza in Hammond, Indiana. The restaurant was located on State Line Road, the boundary between Hammond, Indiana, and Calumet City, Illinois. She arrived at work around 10 a.m. While she was preparing to open the restaurant, she heard two gunshots "very close" in time. Dietz went to the window of the pizza parlor and saw a man across the street holding a gun with his arm outstretched. She identified defendant in court as the man she observed holding a gun. Defendant was standing on one side of State Line Road and pointing in the direction of State Line Pizza. He was standing near a black car that was "parked oddly, partly in the street, partly in the lawn." Dietz called 911 while looking out the window. She periodically ducked down to avoid being seen. She later saw defendant run from the scene into Calumet City.

¶ 5     Dietz also saw another man lying on the street near a sport utility vehicle (SUV). She did not see a gun in this man's hand. The man then got up, moved to the other side of the SUV, and ran out of her view. She admitted that during her interview with police, she told them that she saw the other man point a gun at defendant.

¶ 6     Antwon Hall operates a barbershop on the Indiana side of State Line Road. He arrived at work between 9:30 and 10 a.m. on February 19, 2019. While he was preparing his shop for his first customer, he heard a "loud boom." Hall went to the window and saw a man across the street with a gun, but he did not see the man fire the weapon. He described it as a big silver gun and identified defendant in court as the man he saw with the silver gun. Defendant was standing

2

across the street near the passenger side of a little black car. The car was parked on the curb and was "sideways."

¶ 7    When Hall looked out again, he saw another man on his side of the street "like fly up in the air and his feet landing and he is like kicking." The witness then realized the men were shooting at each other. He ducked again and heard a small shot. He did not see the second individual with a gun. After the shooting, Hall saw defendant pace, jump over a fence, and then take "off running."

¶ 8    Hammond Sergeant Kelly Mickey was in the area when she responded to a call of shots fired on State Line Road. While she was looking for evidence at the scene, she heard a muffled "help" or "hey" nearby. She instructed other officers at the scene to be quiet so that she could hear the request for help. Sergeant Mickey found a black male face down in the snow between 5 Waltham Street and State Line Pizza. She was not initially able to see if the man was hurt. When she patted him down, she did not find any weapons, but she did observe an injury to his left shoulder area. She spoke with the man, who she later learned was Gibson.

¶ 9    Sergeant Mickey tried to keep Gibson calm and obtain further information about the crime. While she was speaking with Gibson, his breathing became more labored and his consciousness was changing. When Sergeant Mickey began to prepare Gibson for the paramedics, she saw gunshot wounds to his shoulder and the middle of his back.

¶ 10    The video from Sergeant Mickey's body-worn camera was admitted and played for the jury. In the video, the sergeant is observed asking Gibson questions about what occurred and for a description of the shooter. Gibson responded that he was going to buy "weed" from the other individual. He described the shooter as a black male with facial hair wearing all black clothing.

¶ 11    Hammond Lieutenant Chris Berdine was responding to the scene when he received a

description of the possible shooter fleeing westbound. Lieutenant Berdine was in that area, so he turned to check near an American Legion Hall (American Legion) in Calumet City. He then observed an individual matching the description of the shooter in the American Legion parking lot, wearing a black vest and black sweatpants. The officer asked the man if he had a gun, and the man responded that he did. Lieutenant Berdine directed the man to lay down so he could see the man's hands before he handcuffed him. He asked where the gun was, and the man said it was in his vest pocket. A Calumet City police officer reached into the pocket and retrieved the firearm. Lieutenant Berdine identified defendant in court as the man with the firearm.

¶ 12    Lieutenant Berdine brought Dietz and Hall to the American Legion to see if either could identify defendant in a "drive-by showup." Both witnesses identified defendant as the suspect. Lieutenant Berdine identified a photograph of the firearm recovered from defendant and described it as a chrome revolver with a black handle. The firearm was loaded with three live rounds and two fired rounds.

¶ 13    Calumet City Detective Keith Kwiatkowski arrived at the American Legion, after being informed that a suspect had been detained. The American Legion was half a city block from State Line Road. The detective identified defendant in court as the suspect detained. He then went to State Line Pizza to obtain any video surveillance that may have captured footage of the incident. He observed three cameras installed at the restaurant and requested the footage. He received the footage and reviewed the video recordings. Clips of the surveillance footage were played in court with Detective Kwiatkowski providing details.

¶ 14    One camera angle showed a black vehicle driving along the road and stop with the car out of the frame, except for the rear passenger side corner. The footage from that camera showed a shadow of a figure approach and appeared to enter the car. Another clip showed a struggle

4

between two individuals move from the vehicle to the outside of that vehicle. One person dressed in black is then seen with his arm outstretched and pointed across the street. Detective Kwiatkowski testified that this video showed defendant with a handgun in his right hand. A video from a different camera showed a figure run into view and collapse onto State Line Road. Detective Kwiatkowski testified that the victim is seen lying "on the ground, just the driver's side area, of this black SUV." A video from the first camera then showed defendant enter the frame and flee the scene. Detective Kwiatkowski testified that he observed a handgun in defendant's right hand as he fled. Video from a third camera showed Gibson enter the scene, leave the view, and then flee out of view. Detective Kwiatkowski learned during his investigation that Gibson fired a weapon at defendant, but it was not captured on the surveillance video.

¶ 15 Calumet City Officer William Gavin, a crime scene investigator, reported to the American Legion because a potential suspect had been detained. He identified defendant in court as the man who had been detained. He described the handgun recovered from defendant as a Ruger revolver, with two casings and three live rounds in the cylinder. He also photographed the scene where Gibson had been found. Officer Gavin then recovered a "mini Glock" handgun and noted that it was loaded with seven rounds.

¶ 16 On February 21, 2019, Calumet City Sergeant Brian Smith photographed and recovered a spent shell casing, that had been found by Detective Kwiatkowki, near 5919 State Line Road.

¶ 17 Kurt Zielinski, a forensic scientist with the Illinois State Police in firearms identification, was assigned to test the Glock semiautomatic handgun recovered from the scene, along with the spent casing recovered from State Line Road. Following his testing, Zielinski concluded that the spent casing was fired from the Glock semiautomatic handgun.

¶ 18    Dr. Lauren Woertz, an assistant medical examiner with the Cook County Medical Examiner's Office, was present and supervised the autopsy of Gibson. The primary injury was a gunshot wound to the back, with the entrance on the right side of the back and an exit wound on the left shoulder. The wound path was through the left lung and the heart, back to front and upward. Dr. Woertz determined the cause of death to be a gunshot wound to the back and the manner of death was homicide.

¶ 19    Calumet City Detective James Burnett executed a search warrant on a 2005 Honda Accord located at the scene. During his search, he found a firearm holster in the lower compartment of the driver's side door. The vehicle registration in the glove box indicated that the car was registered to defendant. The detective also recovered a white bag containing several small plastic bags of packaged cannabis from in front of the gear shift, as well as a backpack from the backseat and a tan plastic shopping bag from the floorboard of the rear passenger side. The tan shopping bag contained seven packages of cannabis. Additional bags of cannabis were recovered from the backpack.

¶ 20    The parties stipulated that a forensic chemist with the Illinois State Police crime lab tested the bags of suspected cannabis. One bag containing six plastic bags weighed 20.7 grams, the second bag containing three plastic bags weighed 49.2 grams, and a third bag containing eight plastic bags weighed 18.4 grams. The chemist opined to a reasonable degree of scientific certainty that the plant material from two of the plastic bags from the second bag tested positive for the presence of cannabis in the amount of 48.2 grams. After the State rested its case-in-chief, defendant moved for a directed finding, which the trial court denied.

¶ 21    Defendant testified on his own behalf. In February 2019, defendant possessed a valid Firearm Owner's Identification (FOID) card, as well as a concealed carry license (CCL). On

February 18, 2019, defendant received a text message from Gibson, asking to buy seven ounces of cannabis for $650. The men agreed to meet the next morning on State Line Road. Defendant had been selling cannabis for five to six months, but he did not have a license to sell cannabis. He brought his gun everywhere he went since he had a CCL.

¶ 22     The following morning, defendant drove to meet Gibson on State Line Road. On the way, he "FaceTimed" Gibson to tell Gibson he was there. Gibson indicated that he was on his way. Defendant saw Gibson walking in his direction, wearing a gray hooded sweatshirt with the hood pulled over his head. He beeped his horn to get Gibson's attention. Defendant had his handgun holster on the passenger seat with his backpack, and in the back seat, he had seven ounces of cannabis in a grocery bag for Gibson. Defendant explained that when he was driving, he would usually remove his gun and holster and place it on the passenger seat next to him. If someone was in the car with defendant, he would keep it in the driver's side door.

¶ 23     When Gibson approached, defendant did not have his car in park. As he reached to unlock the passenger door, he saw his gun and backpack were on the seat. He put the handgun on his lap. As he was putting the backpack in the back seat, Gibson opened the passenger door and entered the car. Defendant testified that everything happened "extremely fast." While defendant's left hand was on the steering wheel and his right hand was behind the seat, he was "ambushed" when Gibson came over to defendant's side of the car. Defendant was "alarmed" and felt a heavy weight on his lap. He let go of his backpack and the steering wheel. Defendant tried to pin Gibson's arm down on defendant's gun. Defendant screamed and told Gibson that he was not going to do anything to Gibson. Gibson said he was going to "blick" defendant, which defendant understood to mean that Gibson was going to kill defendant.

¶ 24     The men engaged in a struggle for the gun. Defendant realized he did not have control of

the gun and that Gibson's hand was on the gun. Defendant tried to pry it out of Gibson's grip. During this struggle, defendant lost control of his car with the passenger door still open. The car rolled partially onto the parkway. Both men were still holding onto the gun. While Gibson was pulling on the gun, defendant put his finger behind the trigger.

¶ 25     According to defendant, as Gibson was pulling on the gun, defendant was pulled with the gun across both of the front seats and out of the car. Defendant then "lunged" out of the car, which caused Gibson to lose his grip on the gun. Defendant took control of his gun. He then saw Gibson was going around defendant's car and was reaching toward his waistband, which made defendant think that Gibson was armed. Defendant thought he had "to shoot" and fired the first shot while Gibson ducked around the other side of the car. Defendant then swung his arm out, fired again, and struck Gibson, who fell to the ground. Defendant did not fire any more shots.

¶ 26     Defendant walked toward Gibson and told him not to move while defendant was going to call for help. Defendant went back to his car, got his gun, and then noticed that Gibson had moved. Defendant tried to take cover behind some trees and saw Gibson was behind an SUV. Gibson raised his gun and shot at him. Defendant then jumped over a fence and ran to the side of a house. He continued to run down the street. He called 911 and stayed on the phone with 911 for seven minutes.

¶ 27     Defendant testified that he did not plan to shoot or rob Gibson that day. He had his gun because he has a CCL. At the time he fired his gun, defendant feared for his life. Defendant denied attacking Gibson. He admitted that the second shot struck Gibson in the back, and at that point, he had not seen Gibson with a gun. He did not see Gibson with a gun until after Gibson had been shot and then Gibson fired a return shot towards defendant. During his interview with police, defendant told them he was there to do business. He did not tell the officers that he was

meeting Gibson to sell cannabis. Defendant did not disclose this because he did not want to make the situation worse. He denied shooting Gibson over cannabis.

¶ 28    In rebuttal, Calumet City Sergeant Kevin Rapacz investigated Gibson's homicide and identified defendant in court as the offender. The sergeant participated in the interview of defendant, along with Detective Kwiatkowski. During the interview, defendant never told the officers that he feared for his life.

¶ 29    Following closing arguments, the jury found defendant guilty of second degree murder and armed violence. Defendant moved for a judgment notwithstanding the verdict or a new trial, which the trial court subsequently denied. At the conclusion of the sentencing hearing, the court imposed consecutive terms of 15 years for the armed violence conviction and 7 years for second degree murder. Both sentences were to be served at 50%. Defendant's motion to reconsider the sentence was denied.

¶ 30    On appeal, defendant raises three issues: (1) the armed violence statute (720 ILCS 5/33A-2(a) (West 2018)) violates the second amendment both on its face and as applied to him; (2) the trial court denied him a fair trial by allowing the prosecutor and witnesses for the State to refer to Gibson as the "victim"; and (3) the trial court abused its discretion in denying defendant's request for Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 24-25.09X), which would have informed the jury that a noninitial aggressor has no duty to retreat.

¶ 31    Relying on the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), defendant argues the Illinois armed violence statute (720 ILCS 5/33A-2(a) (West 2018)) violates the second amendment to the United States Constitution (U.S. Const., amend. II) on its face and as applied to him. Specifically, he contends that the

9

armed violence statute infringes on his right to carry a handgun outside the home for self-defense, in violation of the second amendment. He further asserts that "there is no historical analogue for prohibiting the lawful carrying of a handgun while one also possesses cannabis," including with the intent to deliver. The State responds that the armed violence statute comports with the second amendment both on its face and as applied to defendant and that *Bruen* does not render the armed violence statute unconstitutional. The State maintains that prohibiting the possession of a dangerous weapon, including a firearm, during the commission of a felony is consistent with our country's historical regulation of firearms.

¶ 32    " 'Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional.' " *People v. Rizzo*, 2016 IL 118599, ¶ 23 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 90). "That presumption applies with equal force to legislative enactments that declare and define conduct constituting a crime and determine the penalties imposed for such conduct." *Id.* The party challenging the statute must overcome this presumption and clearly establish that it violates the constitution. *Id.* This court has a duty to uphold the constitutionality of a statute whenever reasonably possible and resolve any doubt in favor of the statute's validity. *Id.*

¶ 33    We address defendant's facial challenge of the armed violence statute first. A facial challenge to the constitutionality of a statute is the most difficult challenge to mount. *People v. Thompson*, 2025 IL 129965, ¶ 14. A statute is facially unconstitutional only if no set of circumstances exists under which it would be valid; the defendant's specific facts are irrelevant in this analysis. *Id.* The fact that the statute could be found unconstitutional under some set of circumstances does not establish the facial invalidity of the statute. *People v. Davis*, 2014 IL 115595, ¶ 25.

¶ 34    The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has recognized that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Bruen*, 597 U.S. at 8-9 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010)).

¶ 35    Significantly, however, the Supreme Court has consistently concluded that the second amendment right to bear arms "is not unlimited." *Heller*, 554 U.S. at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The Court does "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation." (Emphasis in original.) *Id.* at 595. And, simply put, "[t]he Second Amendment *plainly does not protect* the right to use a gun to rob a bank." (Emphasis added.) *Id.* at 636 (Stevens, J., dissenting, joined by Souter, Ginsburg, and Breyer, JJ.).

¶ 36    The Supreme Court in *Bruen* reaffirmed that the protection of the second and fourteenth amendments (U.S. Const., amends. II, XIV) extends to "an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. The *Bruen* Court then set forth the analytical framework for evaluating claims under the second amendment, holding that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. When the conduct falls within this protection, the government must justify any regulation of the conduct by showing the regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id.* If a firearm regulation is consistent with

11

this historical tradition, then a court may conclude that the individual's conduct falls outside the protection of the second amendment. *Id.*

¶ 37    Consistent with the *Bruen* test, the Illinois Supreme Court has recently held that "when the second amendment's plain text covers an individual's conduct, that conduct is presumptively protected. The State must then justify its regulation by demonstrating that it is consistent with this nation's historical tradition of firearm regulation." *Thompson*, 2025 IL 129965, ¶ 43. The *Bruen* test has been described as the following.

> " 'The first inquiry is: Does the plain text of the second amendment cover an individual's conduct? [Citation.] If not, the regulation is constitutional because it falls outside the scope of protection. But if it does, the individual's conduct is presumptively protected by the second amendment, and we move to the second inquiry: Is the State's regulation "consistent with the Nation's historical tradition of firearm regulation[?]" ' [Citation.]" *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 52 (quoting *Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 2024 IL App (3d) 210073, ¶ 13).

¶ 38    With this framework, we turn to defendant's facial challenge to the armed violence statute. The armed violence statute at issue here provides, in relevant part: "A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law ***." 720 ILCS 5/33A-2(a) (West 2018). "A person is considered armed with a dangerous weapon *** when he or she carries on or about his or her person or is otherwise armed with a Category I, Category II, or Category III weapon." *Id.* § 33A-1(c)(1). A Category I weapon includes a handgun and any other firearm small enough to be concealed upon the person. *Id.* § 33A-1(c)(2). In this case, the predicate felony of which the defendant was charged is the

delivery or possession of cannabis with the intent to deliver. See 720 ILCS 550/5(c) (West 2018) (any person who delivers or possesses with intent to deliver "more than 10 grams but not more than 30 grams of any substance containing cannabis is guilty of a Class 4 felony").

¶ 39    Contrary to defendant's claim that the conduct at issue is his right to carry a firearm in self-defense, the conduct at issue is whether the second amendment protects his right to possess a weapon while in the commission of the delivery of cannabis. The obvious answer to that question is *no*, as we explain for the reasons that follow.

¶ 40    To begin, defendant's conduct is not protected by the "plain text" of the second amendment. See *Bruen*, 597 U.S. at 25. Although the second amendment protects the right of citizens to use arms for self-defense, *Bruen* specifically limits the second amendment's scope to citizens who are law-abiding, who are responsible, and who use firearms for self-defense. See *id.* at 70-71. It, unequivocally, does not protect a defendant's right to possess a firearm while committing a felony.

¶ 41    Returning to *Hatcher*, we note the court's decision recognized that the *Bruen* test "applies only to laws that attempt[ ] to regulate the gun possession of law-abiding citizens." (Internal quotation marks omitted.) *Hatcher*, 2024 IL App (1st) 220455, ¶ 55 (citing *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 27); see *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37. Additionally, Illinois court have similarly rejected constitutional challenges of various criminal offenses following *Bruen*. See *People v. Ramirez*, 2023 IL 128123, ¶ 27 (finding that firearms with defaced serial numbers "are not covered by the plain text of the second amendment because they are not typically used by law-abiding citizens for lawful purposes"); *Hatcher*, 2024 IL App (1st) 220455, ¶¶ 55-61 (upholding the constitutionality of the aggravated unlawful use of a weapon statute when the defendant did not possess a valid FOID card, did not have a CCL

license, and was under the age of 21); *Mobley*, 2023 IL App (1st) 221264, ¶¶ 27-29 (rejecting the defendant's second amendment challenge of the unlawful use of a weapon by a felon (UUWF) statute); *Baker*, 2023 IL App (1st) 220328, ¶ 37 (in upholding the UUWF statute, the reviewing court observed that the *Bruen* court repeated the phrase "law-abiding citizens" 18 times).

¶ 42    Further, several reviewing courts have considered and rejected second amendment challenges to the unlawful possession of a firearm by a repeat felony offender statute (previously known as the offense of armed habitual criminal (AHC)) (720 ILCS 5/24-1.7 (West 2024)). See *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 22 (finding the AHC statute constitutional on its face "because the second amendment only protects the right of law-abiding citizens to bear arms, the *Bruen* test does not apply to the armed habitual criminal statute"); *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 20 (finding that statutes prohibiting the possession of firearms by felons, including the AHC statute, generally fell "outside [the] scope" of the second amendment); *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 17 (upholding the AHC and concluding that "by its plain language, the Supreme Court explicitly sanctioned the prohibition on the possession of firearms by felons"). Moreover, even when panels have reviewed the historical framework for cases involving the possession of firearms by felons, these challenges still failed. See *People v. Travis*, 2024 IL App (3d) 230113, ¶ 33 (concluding that the "AHC and UUWF statutes are consistent with this nation's history of preventing potentially dangerous individuals from exercising the right to bear arms, and their effects on law-abiding citizens' right to self-defense are minimal"); *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 100 (finding that "both the founding-era historical record and Supreme Court precedent support the ability of our legislature to prohibit firearm possession by people who have demonstrated disrespect for legal norms of society" (internal quotation marks omitted)).

¶ 43    To conclude, the armed violence statute *does not* regulate the possession of a firearm by law-abiding citizens. As stated above, a person commits armed violence by committing a felony while in possession of a dangerous weapon, *i.e.*, a firearm. 720 ILCS 5/33A-2(a) (West 2018). An individual committing a felony is not a law-abiding citizen. Accordingly, under *Bruen*, the possession of a firearm while committing a felony is not protected under the second amendment. Since the plain text of the second amendment does not cover this conduct, the armed violence statute is constitutional on its face, and we need not reach the historical consideration of this regulation. Defendant's facial challenge fails.

¶ 44    Defendant also contends that the armed violence statute is unconstitutional as applied to him. The State correctly points out that defendant failed to allege this as-applied constitutional challenge in the trial court and has forfeited this claim on appeal. *People v. Thompson*, 2015 IL 118151, ¶ 39 ("[D]efendant forfeited his as-applied challenge *** by raising it for the first time on appeal"). Defendant concedes that he is raising this claim for the first time on appeal but asserts that this court can still consider his as-applied challenge because Illinois courts have held that when all the facts and circumstances necessary to decide the defendant's claim are already in the record, the claim may be raised and reviewed on appeal for the first time. *Brooks*, 2023 IL App (1st) 200435, ¶ 57. Since we find the record contains all the necessary facts and circumstances to consider defendant's as-applied challenge, we review his claim.

¶ 45    Here, there is no dispute that defendant arranged to meet Gibson in public to sell him seven ounces of cannabis and that between 10 and 30 grams of cannabis were recovered from defendant's car. Defendant fails to cite any relevant authority to support his proposition that his CCL permitted him to possess cannabis with the intent to deliver while armed with a firearm. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant to adequately

develop his argument with citation of relevant authority. It is well settled that conclusory contentions unsupported by argument violate Rule 341(h)(7) and are deemed forfeited. *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 132; see *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 170.

> "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented; this court is not a repository into which an appellant may foist the burden of argument and research; it is neither the function nor the obligation of this court to act as an advocate or search the record for error." *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29.

Because defendant has no support for this claim, it is forfeited.

¶ 46     Nonetheless, had this issue been preserved, the second amendment, according to *Bruen*, does not cover the possession of firearms by those who are not law-abiding. More specifically, defendant's possession of a gun while selling cannabis is clearly not protected conduct. To repeat, as Justice Stevens aptly pointed out, "[t]he Second Amendment plainly does not protect the right to use a gun to rob a bank" (*Heller*, 554 U.S. at 636 (Stevens, J., dissenting, joined by Souter, Ginsburg, and Breyer, JJ.)). So too here, the second amendment does not protect the right of a person to possess a gun while unlawfully selling cannabis. Like defendant's facial challenge, his as-applied challenge of the armed violence statute also fails.

¶ 47     Defendant next asserts that the trial court abused its discretion by allowing the prosecutor and multiple witnesses for the State to refer to Gibson as the "victim." Specifically, he asserts that the use of the term "victim" in a self-defense case "exerted improper emotional influence, diminished the presumption of innocence and the State's burden of proof, and invaded the province of the jury by providing a legal conclusion to a central dispute in the case—whether the

shooting was a murder or a justified use of deadly force." The State responds that no error occurred because the use of the term "victim" is a "non-inflammatory, denotative term to refer to the person harmed as the result of an alleged crime." The State maintains that defendant was not prejudiced by the use of this term.

¶ 48    To begin, we note defendant has again failed to raise this claim in his posttrial motion. To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Defendant concedes the issue was not preserved but alternatively argues his trial counsel was ineffective for failing to preserve this claim and we should review it under the plain error doctrine.

¶ 49    The plain error doctrine permits a reviewing court to consider an unpreserved error when a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Before considering whether plain error applies, we first determine whether any error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 50    Defendant contends that both Detective Kwiatkowski and Officer Gavin were allowed over the defense objection to refer to Gibson as "the victim" multiple times during their respective testimony. Specifically, Detective Kwiatkowski used the term "victim" when he was describing Gibson's movements on the surveillance videos from State Line Pizza. Officer Gavin

17

referred to Gibson as "the victim" in his explanation that Gibson had been transported to the hospital prior to the officer's arrival at the scene. Additionally, the prosecutor referred to Gibson by name, as well as the term "victim," during opening statement and rebuttal closing argument.

¶ 51    A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *People v. Turner*, 2018 IL App (1st) 170204, ¶ 64. An abuse of discretion arises only when the trial court's ruling is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *People v. Sloan*, 2024 IL 129676, ¶ 15. Here, defendant must show that the trial court abused its discretion in overruling the defense's objection in referring to Gibson as "the victim."

¶ 52    Defendant cites multiple cases from other states, as well as law review articles, reasoning that the use of the term "victim" "may be improper" in self-defense cases. However, it is well established that decisions from foreign jurisdictions are not binding in Illinois. *People v. Colone*, 2024 IL App (1st) 230520, ¶ 65. Further, defendant has failed to cite a single Illinois case finding that a defendant asserting self-defense was denied a fair trial because the State or its witnesses referred to the individual killed as a "victim." As previously noted, Rule 341(h)(7) requires an appellant to adequately develop his argument with citation of relevant authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 53    In fact, Illinois courts have rejected this argument or held that the term was not so prejudicial as to deny the defendant a fair trial. See *People v. Wasmund*, 2022 IL App (5th) 190525, ¶¶ 71, 99 (conviction affirmed where prosecution's use of term "victim" intermittently during four-day trial was not error, although the defendant claimed to have acted in defense of property). In *People v. Zernel*, 259 Ill. App. 3d 949, 957 (1994), the defendant in a criminal sexual assault case argued that the prosecutor's repeated references to the complainant as the

"victim" was error. The reviewing court found "no case law indicating that a prosecutor's use of the term 'victim' when referring to a complaining witness is prejudicial error." *Id.* The *Zernel* court further observed that the statutory definition of "victim," as used under the criminal sexual assault and other related statutes, stated that a " 'victim' means 'a person *alleging* to have been subjected to an offense.' " (Emphasis in original.) *Id.* (quoting 720 ILCS 5/12-12(g) (West 1992)).

¶ 54    Additionally, multiple recent unpublished decisions have considered and rejected this very same argument. In *People v. Hurley*, 2022 IL App (1st) 200650-U, ¶ 51, the reviewing court observed that the term "victim" is "often used as an explanatory term for the person harmed as the result of an alleged crime." The *Hurley* court pointed to multiple statutes to illustrate "the legislature's common usage of the term to distinguish the person allegedly *harmed* from the person *doing the harm*." (Emphases in original.) *Id.* (citing 720 ILCS 5/12-3.05(d), 10-9(a)(10), 11-0.1, 18-1(b) (West 2018)). In finding no error, the reviewing court concluded that the prosecutor's use of the word "victim" was justified based on the undisputed evidence that the defendant stabbed the injured party during the course of multiple physical altercations. *Id.* ¶ 52.

¶ 55    Similarly, in *People v. Zabrzenski*, 2023 IL App (1st) 220428-U, ¶ 50, the reviewing court observed that the State's theory of the case was that the decedent was the "victim," and it was "entitled to advance that theory to the jury during the adversarial process." In noting that the references were "brief and inconspicuous," the *Zabrzenski* court found that "[t]he references were made unemotionally for identification and shorthand purposes to refer to the person harmed rather than being a designed campaign to unfairly persuade the jury that defendant acted without legal justification." *Id.* ¶ 49.

¶ 56    Further, we find the three Illinois cases relied on by defendant to be readily

distinguishable. See *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 86; *People v. Anderson*, 234 Ill. App. 3d 899, 909 (1992) (affirming the defendant's conviction over his claim that the State improperly used the term "victim" to play on the sympathies and prejudices of the jury); *People v. DeSavieu*, 120 Ill. App. 3d 420, 432 (1983) (finding that the State's reference to the deceased as "the victim," even coupled with references to the deceased's surviving family and his standing in the community, were not so inflammatory as to have affected the jury's ability to rationally evaluate the evidence).

¶ 57    Additionally, in *Cruz*, the defendant argued the trial court erred when it responded to a question sent out by the jury in which the jury referred to the decedent in its note as "the victim." *Cruz*, 2021 IL App (1st) 190132, ¶ 70. In that case, the jury sent a question to the court during deliberations asking " '[c]an we see evidence the defendant lunged at victim during fight[?]' " *Id.* The defendant in *Cruz* argued that by playing the video requested by the jury, the trial court implicitly communicated to the jury that the person harmed was "the victim," despite the defendant claiming he acted in self-defense. *Id.* ¶ 71. The defendant argued that the court should have admonished the jury that the person who was stabbed was not a "victim" at that juncture of the case and that the trial court's failure to do so amounted to an implicit endorsement of the view that the person who was harmed was legally a victim. *Id.* ¶ 79. We rejected the defendant's argument and explained that the use of the word "victim" could have just referred to the person who was injured, *i.e.*, the person who was stabbed during the fight, without amounting to an insinuation that the defendant was guilty. *Id.* ¶¶ 87-88.

¶ 58    We reach the same conclusion here. Based on our review of the record, we find the references to Gibson as "the victim" were insignificant and unobtrusive. The officers used the term "victim" to identify Gibson as the person in the surveillance video or the person who had

been taken to the hospital. The State's theory of the case was that defendant was not acting in self-defense and his shooting of Gibson was not justified. Thus, under this theory, the State considered Gibson to be the victim.

¶ 59    Defendant also incorrectly asserts that "[n]o statute or jury instruction directs that anyone against whom a crime was allegedly committed is properly called a 'victim.' " As previously noted, the criminal sexual assault statute refers to the complainant as "the victim" multiple times. See 720 ILCS 5/11-1.20 (West 2018). Additionally, multiple jury instructions contain the term "victim" in reference to the individual harmed. See, *e.g.*, IPI Criminal No. 8.04 (aggravated kidnapping); No. 9.33 (sexual relations within families); No. 9.43B (sex offense); No. 11.55 (definition of criminal sexual assault); No. 14.03 (robbery where victim 60 years of age or over, or victim physically handicapped); No. 14.19 (aggravated robbery). Illinois courts have consistently rejected any claim that use of the term "victim" in jury instructions amounts to error. See *People v. Brooks*, 246 Ill. App. 3d 777, 790-91 (1993) (finding the jury was properly instructed and instructions are not to be considered in isolation); *People v. Carroll*, 260 Ill. App. 3d 319, 336 (1992) (no error occurred because the term as used in the instructions did not attribute guilt in any way to the defendants).

¶ 60    Moreover, as the State points out, the term "victim" was used in multiple stipulations, agreed to by both parties, and utilized by defendant to refer to Gibson during his own testimony. "The rule of invited error or acquiescence is a procedural default sometimes described as estoppel." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

> "Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial

upon the basis of error which that party injected into the proceedings." *Id.* While this invited error acts as an estoppel to any plain error analysis (*People v. Quezada*, 2024 IL 128805, ¶ 59), defendant may still argue trial counsel's ineffectiveness (*People v. Johnson*, 2023 IL App (4th) 220201, ¶ 38).

¶ 61    Even if defendant was not estopped, he has failed to demonstrate that the references to Gibson as "the victim" denied him a fair trial. The jury was well aware of the allegations against defendant as presented by the State, as well as defendant's claim of self-defense. Since the term "victim" was used sporadically by both parties, we cannot conclude that the trial court erred, much less that it committed the kind of "clear or obvious" error necessary to find plain error.

¶ 62    Further, defendant has failed to show that his trial counsel was ineffective for failing to preserve this claim. Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id.* at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 63    Since we have already found that no error occurred, it necessarily follows that defendant

cannot establish either prong under *Strickland*. Counsel's performance cannot be considered deficient when no error occurred. Nor could defendant have suffered any prejudice by counsel's actions. Defendant's claim of ineffective assistance fails.

¶ 64    Finally, defendant contends that the trial court abused its discretion by denying his request to instruct the jury with IPI Criminal No. 24-25.09X, which would have informed the jury that he, as the noninitial aggressor, had no duty to retreat.

¶ 65    The purpose of jury instructions is to provide the jury with the correct legal principles relevant to the evidence presented so the jury may reach a correct conclusion pursuant to the law and the evidence. *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). A defendant is entitled to a jury instruction when the evidence supports it. *Sloan*, 2024 IL 129676, ¶ 14. If the IPI instructions include an applicable and accurate instruction upon which the trial court determines the jury should be instructed, the trial court must use that instruction. *Bannister*, 232 Ill. 2d at 81 (citing Ill. S. Ct. R. 451(a) (eff. July 1, 2006)). Instructions that are not supported by the evidence or the law should not be given, nor should the jurors be given an instruction which could confuse them. *Sloan*, 2024 IL 129676, ¶ 14. Jury instructions are to be considered as a whole, with the goal of guiding the jury to a verdict that is based on the applicable legal principles. *Id.*

¶ 66    We review the trial court's determination about what jury instructions to give for an abuse of discretion. *Id.* ¶ 15. As previously noted, an abuse of discretion arises only when the trial court's ruling is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.* "A court abuses its discretion when it gives instructions that are unclear, misleading, or 'not justified by the evidence and the law.' " *Id.* (quoting *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009)).

¶ 67    To present the affirmative defense of self-defense, the defendant must present evidence

of the following elements:

> "(1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable." *People v. Gray*, 2017 IL 120958, ¶ 50 (citing 720 ILCS 5/7-1 (West 2010)).

IPI Criminal No. 24-25.06 instructs the jury on these elements of self-defense.

¶ 68      At the close of the evidence, the trial court instructed the jury, in part, regarding first degree murder (IPI Criminal No. 7.01); regarding second degree murder (Illinois Pattern Jury Instructions, Criminal, Nos. 7.05 (approved Jan. 30, 2015), IPI Criminal No. 7.06); and on the justification for the use of force (IPI Criminal No. 24-25.06). Specifically, IPI Criminal No. 24-25.06 provides the following:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

¶ 69      During the jury instruction conference, defendant sought an additional self-defense instruction, IPI Criminal No. 24-25.09X, which states: "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor." The trial court denied defendant's request. The court reasoned that a

loaded firearm in a vehicle could not be seen as a "nonaggressive gesture." The court further found that defendant admitted that Gibson saw the firearm and concluded that the duty to retreat instruction was not appropriate, given the testimony presented.

¶ 70      According to defendant, the trial court's refusal to give the duty to retreat instruction left the jury with "the false impression" that defendant provoked Gibson's use of force, and thus, defendant had "a legal duty to retreat before defending himself with lethal force." As support, defendant contends that the court's refusal to give the duty to retreat instruction went to a critical part of the dispute, *i.e.*, whether defendant was the initial aggressor by having a firearm on his lap or if Gibson was the initial aggressor by attempting to take the gun from defendant by force.

¶ 71      Recently, the supreme court in *Sloan* considered an argument regarding the duty to retreat instruction. There, the defendant and his brother David had spent the day drinking and shooting guns. After several hours, David called his wife to take the intoxicated defendant (brother) to the defendant's home. When she arrived, they loaded David's guns in the trunk of the car. David's wife drove with David in the passenger seat and the defendant rode in the back seat. During the drive, the defendant was bickering and trying to argue with David. When they got to the defendant's home, both men exited the vehicle and David said if the defendant wanted to fight, then they should fight. A physical fight ensued briefly outside the home before David's wife separated the men. The defendant then entered the house. David and his wife followed a few seconds behind the defendant. The door was not locked. When they entered, David was unarmed and walked toward the defendant's room. David's wife saw the defendant with a gun on his shoulder. She could not recall if David said anything before the defendant fired the weapon. In his testimony, the defendant admitted to being intoxicated and to the events leading up to the shooting, but he thought the other man in the passenger seat was a stranger, someone he did not

know. After the fight, he thought this unknown man had entered his house and was walking toward the defendant's bedroom. *Sloan*, 2024 IL 129676, ¶¶ 4-9.

¶ 72     At trial, the defendant requested the duty to retreat instruction, but the trial court denied the request. The court found there was no evidence that either the defendant or David was the initial aggressor, but instead the confrontation amounted to mutual combat. *Id.* ¶ 10. The jury ultimately found the defendant guilty of first degree murder, as well as some additional charges. *Id.* ¶ 11.

¶ 73     The defendant contended on appeal that the trial court abused its discretion in denying his request for the duty to retreat instruction. The appellate court agreed with the defendant, reversed his conviction, and remanded for a new trial. *Id.* ¶ 12.

¶ 74     Before the supreme court, the State argued that the instruction was properly denied by the trial court because it was "irrelevant, unsupported by the evidence, and confusing to the jury." *Id.* ¶ 13. The defendant responded that the instruction was required because "the State's arguments improperly suggested he had a duty to avoid the danger before using force in self-defense." *Id.* The *Sloan* court agreed with the State.

¶ 75     The supreme court found that the facts supported the trial court's decision because there was no evidence presented that either the defendant or David was the initial aggressor. *Id.* ¶ 18. The court found that "the trial court properly served as a gatekeeper as to whether the jury instruction was needed under the facts." *Id.* ¶ 21. In reviewing the circumstances of the case, the *Sloan* court concluded that "the facts did not warrant the instruction," noting that the defendant did retreat after David's wife broke up the fight. *Id.* Further, the court found that there was no evidence that David provoked the defendant inside the house before the defendant shot him. *Id.*

¶ 76     Additionally, the supreme court rejected the defendant's assertion that the instruction was

necessary to counter the State's questions suggesting the defendant had a duty to retreat and failed to do so before using force against David. *Id.* ¶ 22. Rather than pointing to a duty to retreat, the court found the State sought to question the reasonableness of the defendant's claim of self-defense. *Id.* The supreme court concluded that the trial court "did not weigh competing evidence or make factual findings that defendant was the initial aggressor. The trial court merely concluded there was no evidence presented to support that David was the initial aggressor and hence defendant's duty to retreat instruction, as was its role." *Id.* ¶ 24.

¶ 77 Defendant attempts to distinguish *Sloan* from the facts of the present case. He contends that during rebuttal closing argument, the State "explicitly told the jury that if [defendant] was really in fear for his life, he should have run instead of firing his weapon." He further asserts that the State raised the issue of who was the initial aggressor by arguing that the presence of defendant's gun necessarily made him the initial aggressor. However, when these comments are read in context, it is clear that the prosecutor was arguing that defendant's action of shooting Gibson was not justified. There was no suggestion that defendant had a duty to retreat. See *People v. Alexander*, 408 Ill. App. 3d 994, 1003 (2011) (finding that because the defendant's self-defense claim was based on the reasonableness of his use of force, rather than whether he had a duty to retreat, the trial court's "failure to *sua sponte* instruct the jury under IPI Criminal 4th No. 24-25.09X did not direct the jury's finding as to an essential element in this case and did not create a risk that the jury misunderstood the applicable law").

¶ 78 Moreover, defense counsel had argued in his closing that the shooting was justified because defendant acted in self-defense. Counsel also argued for second degree murder for "imperfect self defense," based on defendant's unreasonable belief that he was justified to act in self-defense. Following that argument, the prosecutor argued that if defendant wanted to get out

of the situation, he should have run away. She continued by arguing:

"He could have jumped out of the driver's side. He could have [run in] a different direction. Instead he stood there, pulled out his gun, fired a shot, missed, readjusted, and got J'Vonte right as he was crossing the street. That's what the defendant did. Shows that he was the aggressor. The victim was reasonable. The defendant did no such thing, and we know that. This is not a self-defense case because of the location of victim's injuries. His body speak[s] for itself. This is a gunshot wound to the back and it's not at close range.

* * *

*** Ladies and gentlemen, verbal threats are not enough to pull out a firearm and shoot someone in the back. This defendant was the initial aggressor because he is the one that threatened force first because he had a loaded gun on his lap. As soon as the victim saw that, that's why he grabbed at his gun. He grabbed at his gun and was able to break free and it should have ended there, but it didn't.

That gun, we know, was not concealed. It was not in his pocket. It was not in his waistband. It was not on the door. It was not in the holster. He kicked this all off, this defendant. He is the aggressor here. He at the time that he shot the victim was not in any imminent danger. We know that. He was shot in the back running away.

You have to focus at the time of the killing, if his belief with respect to the force that he used [was] reasonable? Absolutely not.

* * *

28

              \*\*\* What the law is when you apply the facts to this case, this is a first degree murder case. This defendant made the choice to do a drug deal out on the street with a loaded firearm. He made the choice to deal drugs that day. He made the choice to go meet with J'Vonte who he barely knows. He went there and made the choice to carry a firearm. He brought a firearm and made the choice to put it on his lap. He made the choice to put it out and not concealed, and then he chose to stay by his car even as the victim ran away, and when he stayed at his car instead of calling 9-1-1 if he was really in fear for his life or maybe running in a different direction, instead he grabbed that firearm and he gripped it. That's the choice that he made. He made the choice to pull that trigger two times. Two times at an 18-year-old boy that was running away and was shot in the back. No longer or not ever a threat to this defendant at that time that this defendant performed those acts which caused his death."

¶ 79    When both parties' closing arguments are viewed in their entirety, it is clear that the duty to retreat instruction was not warranted. As in *Sloan*, the question before the jury was whether defendant's belief that he needed to act in self-defense was reasonable or mitigated to second degree murder based on imperfect self-defense.

¶ 80    Whether defendant was the initial aggressor or the noninitial aggressor was not at issue here. The duty to retreat instruction was unnecessary to resolve whether defendant's belief was reasonable. Thus, the trial court here "properly served as a gatekeeper as to whether the jury instruction was needed under the facts." *Sloan*, 2024 IL 129676, ¶ 21. Since the duty to retreat was not relevant to the facts of the case, the trial court did not abuse its discretion in denying defendant's request for the instruction.

¶ 81    Based on the foregoing reasons, we affirm defendant's convictions and sentence.

¶ 82    Affirmed.

*People v. Redmond*, 2025 IL App (1st) 231795

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CR-03535; the Hon. Michele Pitman, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Brian A. Levitsky, and Adam C. Motz, Assistant State's Attorneys, of counsel), for the People. |