2026 IL App (1st) 241736-U
No. 1-24-1736
Order filed: March 4, 2026

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 11271 |
| | ) | |
| JAMES GREEN, | ) | Honorable |
| | ) | Nicholas Kantas, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's sentence where (1) he did not preserve the issue of the court's supposed disagreement with the jury's verdict, and plain error review is unwarranted; and (2) he failed to show that the court inadequately weighed mitigating factors.

¶ 2    Following a jury trial, defendant James Green was convicted of second degree murder and sentenced to 20 years' imprisonment. On appeal, defendant contends that the trial court erred by imposing this sentence (1) based on a purported disagreement with the jury's verdict and (2) without adequately considering statutory mitigating factors. We affirm.

¶ 3    Defendant was charged with multiple counts of first degree murder arising from the shooting death of Edward Flowers. Because defendant does not challenge the sufficiency of the evidence, we set forth only the background relevant to the issues on appeal.

¶ 4    Betty Clark testified that she last saw Flowers, her son, on January 31, 2016, before he went to a Chicago game room. Then, at approximately 2 a.m. on February 1, 2016, a friend of Flowers informed Clark that Flowers had been shot. Clark went to the hospital, where she learned of Flowers' death.

¶ 5    The State next called Christopher Armistead. He denied being at the game room that night, stating that he had been too intoxicated to remember, but acknowledged that he appeared in the game room's surveillance footage.

¶ 6    The State published several videos from a surveillance camera facing the back of the game room, which are included in the record on appeal and have been viewed by this court. The videos lack audio.

¶ 7    In one video, Armistead sits in a back booth with a man and a woman whom he testified that he could not identify. Another man, whom Armistead identified as Flowers, leans over the table, conversing with the occupants. Then Flowers strikes the man seated by Armistead. The woman pushes Flowers, who turns and walks towards the camera. The man at the table follows Flowers, who talks to the man over his shoulder while continuing to walk forwards, gesturing with one hand and putting the other behind his back. While Flowers faces forward, walking under the camera and out of frame, the man draws a firearm from his pocket. The man advances, aims and discharges the firearm, and walks out of view. Then, someone situated out of frame waves a firearm in the air.

¶ 8    In another video, Armistead and another individual he identified as Mr. Lee drag a limp Flowers on a rug across the game room and out the back door. (Evidence later adduced at trial established that Mr. Lee's name was Willie Harris.)

¶ 9    Armistead further testified that he identified defendant in a photo array the next day. Armistead also gave a signed statement, but, on the stand, he denied telling law enforcement some of the comments contained therein. On cross-examination, Armistead admitted that he recognized the man and woman in the footage as defendant and an individual whom Armistead knew as Coco. (Evidence adduced later at trial established that her name was Nicole Gilbert.)

¶ 10    Retired Chicago police detective Adam Katz testified that he was present when Armistead gave his statement. In the statement, which Katz read to the jury, Armistead stated that at approximately 12:36 a.m. on February 1, defendant shot Flowers after being punched in the face. Defendant then waved the firearm and stood over Flowers, putting the weapon to Flowers' head before shooting into the floor and leaving.

¶ 11    Harris testified that he owned the game room and was working there the night of January 31 into the morning of February 1. He heard a gunshot and saw Flowers fall. Defendant then lifted Flowers "by the neck and was going to shoot him again," but Harris grabbed defendant, "begged" him not to shoot, and escorted him outside. Defendant left but returned "to shoot" Flowers a second time.

¶ 12    The State published surveillance footage recorded without sound by a camera facing the building's front entrance. The footage, which is included in the record on appeal and has been viewed by this court, depicts Harris escorting defendant and Gilbert outside before defendant runs

back inside, firearm in hand. Shortly afterwards, Harris shows defendant, who still holds the weapon, out the front door again.

¶ 13    Harris further testified that he dragged Flowers outside because he did not want people to trample Flowers. Harris later identified defendant in a photo array. On redirect examination, Harris denied employing anyone to act as security at the game room.

¶ 14    Chicago police detective Adam Bednarcyzk testified that he arrived at the game room approximately at 12:35 a.m. and found Flowers lying motionless in the backyard. Bednarczyk called for an ambulance, which transported Flowers to the hospital. Chicago police sergeant Patrick Staunton stated that Flowers arrived in "very critical condition" and was pronounced dead at 2:45 a.m.

¶ 15    Dr. Bartlomiej Radzik, who reviewed Flowers' autopsy, testified that Flowers' manner and cause of death was homicide resulting from a gunshot wound to the back.

¶ 16    Chicago police detective Ruben Weber testified that defendant was arrested in Madison, Wisconsin on March 4, 2016, and later extradited to Chicago.

¶ 17    The defense called Staunton, who testified that Harris had told him he was worried about the game room being closed if Flowers were found inside.

¶ 18    Defendant testified that he knew Flowers before the shooting as "one of the big guys" in the neighborhood but considered their relationship "cool." Defendant stated that he had worked as security at the game room since 2015, and Harris asked him to work the night of January 31, 2016.

¶ 19    Defendant went to the game room with Gilbert, his girlfriend. At this point in defendant's direct examination, defense counsel published the first of several video exhibits which defendant

narrated through his testimony.[1] Flowers, who previously dated Gilbert, sat next to her and "rubb[ed] her leg," touching her inner thigh, and placed "his arms around her." Gilbert told Flowers not to touch her, and he responded that he would "pop" both defendant and Gilbert. Then, Flowers stood and punched defendant in the face before walking away.

¶ 20    Defendant "jumped up" and saw Flowers "reaching." Defendant shot Flowers, explaining to the jury that he did so out of fear for his life because he "knew how [Flowers] will get down." While Flowers was out of view of the camera, a firearm fell from his person, and defendant kicked it away. He denied grabbing Flowers by the neck or putting a firearm to Flowers' head. Defendant left but returned to retrieve the coat and keys he thought he had left behind. Upon hearing that Gilbert had his coat, he departed. On cross-examination, defendant admitted disposing of his firearm afterwards.

¶ 21    The State recalled Weber, who testified that defendant did not tell him that Flowers had a firearm. The parties stipulated that Chicago police forensic investigator Brian Smith would testify that the game room was thoroughly searched, but no firearm was recovered.

¶ 22    Following arguments, the court instructed the jury, in relevant part, regarding the elements of first degree murder, the affirmative defense of self-defense, and second degree murder predicated on serious provocation and an unreasonable belief in the need for deadly force.

---

[1] The report of proceedings reflects that the defense published five such videos, Defense Exhibit Nos. 3-7. The trial court's impound order references a universal serial bus (USB) drive with those exhibits. However, the record on appeal does not contain a USB drive. The record does contain electronically filed video exhibits. The State's exhibits are clearly marked. The remaining seven videos do not indicate which are the five defense exhibits.

¶ 23 The jury found defendant guilty of second degree murder (720 ILCS 5/9-2 (West 2016)). Defendant filed a motion for a new trial or for acquittal, which the trial court denied, stating that it had "no basis *** to disrupt the jury's verdict of second-degree murder."

¶ 24 Defendant's presentence investigative report (PSI) indicated that he was 33 years old on the date of the offense. He was single and had a good relationship with his three daughters. Defendant had good relationships with his brothers and with his mother and stepfather, who raised him and were still supportive of him. He reported an "okay" relationship with his father who was absent "much of his life." Defendant had a good childhood, "although there were struggles at times," and he experienced sexual abuse from an older woman at a young age.

¶ 25 Defendant attended school until the tenth grade but was earning his GED while incarcerated. He was unemployed when arrested, and he had last worked as a cook. Defendant hoped to continue his education in the culinary arts and pursue that as a career.

¶ 26 The PSI detailed defendant's criminal background, which included three juvenile adjudications for possession of a controlled substance and one for burglary. As an adult, he had been convicted of misdemeanor criminal damage to property and was sentenced to 90 days in jail. He also had been convicted of felony aggravated battery by strangulation and felony aggravated discharge of a firearm, receiving sentences of two years' and six years' imprisonment, respectively. He admitted affiliation with "a street gang" from the ages of 13 to 28.

¶ 27 Defendant was receiving medical care for diabetes, degenerative bone disease, and seizures, and he reported using a continuous positive airway pressure (CPAP) machine for sleep. He first consumed alcohol at age 15 and drank daily until age 34. He used marijuana "every blue moon" while younger.

¶ 28  At sentencing, the State called Clark to give her victim impact statement. She stated that Flowers was a loving son, grandson, and father; she wanted "justice" and asked for the maximum sentence. The State argued that defendant exhibited "anger" and "rage" during the shooting as shown in the surveillance footage. The State noted defendant's criminal background, describing him as a "career criminal."

¶ 29  In mitigation, defense counsel proffered the classes defendant had completed during his incarceration, urging that they showed his potential for rehabilitation. Counsel argued that defendant was not the initial aggressor and exhibited "no ill will" in the surveillance footage until after Flowers struck him. Counsel stressed that defendant's conduct was unlikely to happen again because he would not take another security job and intended to leave the neighborhood upon release from custody. Counsel highlighted defendant's supportive family and his desire to be with his daughters. Counsel stressed that defendant had been sexually abused, which made Flowers' "touching and assaulting" of Gilbert "even more triggering." Counsel asserted that further incarceration would be "debilitating" to defendant's health, pointing out defendant's use of a cane. Counsel asked for a 12-year sentence.

¶ 30  In allocution, defendant stated that words could not "express how sorry" he was "for what happened." He asked for forgiveness and said he would have avoided the incident if he could have, wishing that Flowers "did not have to lose his life." However, defendant said he had been "in fear for [his] life." He recognized that "[t]his tragedy has caused not only my loved ones pain, but also my family's loved ones even more pain."

¶ 31  The trial court stated that it had considered the PSI, the evidence, defendant's allocution, counsels' arguments, and "all the statutory and nonstatutory factors in aggravation and mitigation

whether specifically outlined or not," along with defendant's "history and character," "the seriousness of the offense," and "the objective of restoring" him "to useful citizenship."

¶ 32    The trial court added that it "appreciate[d]" Clark's statement and had reviewed and considered "all the evidence" in the case. The court "specifically" noted defendant's PSI. It commented that defendant had "enjoyed" "the benefits" of his supportive mother and stepfather, and defendant's children were now without their father. It additionally described defendant's allocution as "remorseful" and noted his completed coursework The trial court found "no import" in defendant's juvenile history but stated that his felony aggravated battery strangulation conviction "reflect[ed]" on his "ability to appreciate the serious nature of [his] violent actions."

¶ 33    The trial court stated that it "want[ed] to make specific note" of the evidence at trial. It discussed that "clear video evidence" depicted the evening to be "unaggressive" until Flowers struck defendant. There was "no question" that Flowers walked away from defendant, who rose and shot Flowers in the back. The court did not think the evidence reflected Flowers' "turn[ing] around in an aggressive stance toward [defendant]." The court said testimony of defendant's return to the game room and attempt to shoot Flowers again was "concerning" and described the footage of his return as "terrifying." It further said, "there is no justification for this murder," which "was not an accident" but "a terrible reflex." The court remarked that, after Flowers punched defendant and walked away, defendant exhibited "no hesitation" and did not "stop and pause" before shooting Flowers.

¶ 34    The trial court stated that "only one sentence" was "appropriate" for defendant's actions and imposed 20 years' imprisonment. Defendant filed a motion to reconsider—arguing in relevant

part, that the court considered factors inherent in the offense in aggravation and that several mitigating factors were present—which the trial court denied.

¶ 35    On appeal, defendant first argues that the trial court imposed the maximum sentence because it disagreed with the jury's verdict of second degree murder. Defendant highlights the court's statement that "clear video evidence" showed that Flowers turned and walked away from defendant, who rose and shot Flowers in the back. Defendant also points to the court's comment that no "justification for this murder" existed.

¶ 36    The State maintains that defendant did not preserve this issue for review because he did not make a contemporaneous objection or raise it in a postsentencing motion. In his reply brief, defendant contends that the issue was preserved as it "overlaps" with his argument in the motion to reconsider that the court considered in aggravation matters implicit in second degree murder. Alternatively, defendant posits we can review the issue for plain error because the evidence was so closely balanced that the court's purported disagreement "tipped the scales" against him. See *People v. Williams*, 193 Ill. 2d 306, 348 (2000) (a defendant may request plain error review for the first time in a reply brief). He also argues for review based on ineffective assistance of counsel for failure to preserve the sentencing error.

¶ 37    To preserve a sentencing error for review, a defendant must raise the issue in a contemporaneous objection and later in a written postsentencing motion. *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 24. Otherwise, the issue is forfeited. *People v. Redmond*, 2025 IL App (1st) 231795, ¶ 48. "An issue raised *** on appeal does not have to be identical to the objection raised at trial," and this court will not deem an issue forfeited where "it is clear that the trial court had the opportunity to review the same essential claim." *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009).

¶ 38    Here, defendant did not preserve the issue of the trial court's supposed disagreement with the jury verdict. Although issues raised on appeal do not have to be identical to those raised at trial (*id.*), defendant's allegation on appeal that the court purportedly disagreed with the jury's verdict is substantively distinct from his postsentencing claim that the court considered factors inherent in the offense as aggravation. We therefore may only review this issue for plain error or ineffective assistance of counsel.

¶ 39    Plain error review in the sentencing context is available where a clear and obvious error occurred, and (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. See, *e.g.*, *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). An appellant bears the burden of persuasion under both prongs. *Redmond*, 2025 IL App (1st) 231795, ¶ 49.

¶ 40    A court cannot rely on its own opinion of the crime when sentencing a defendant. *People v. Henry*, 254 Ill. App. 3d 899, 905 (1993) (finding error "[b]ased upon the clarity of the trial court's statement" that offense was "disgusting"). The court, however, is presumed to know the law and apply it correctly, and a defendant, as the appellant, has the burden of establishing otherwise. See *People v. Smith*, 176 Ill. 2d 217, 241, 260 (1997) (noting, in reviewing the trial court's sentence in a death penalty case, that the court "is presumed to know the law and apply it properly *** absent an affirmative showing of error"). Moreover, when reviewing for error in sentencing, we " 'consider the record as a whole' " and will not " 'focus on a few words or statements made by the trial court' " in isolation. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 13 (quoting *People v. Reed*, Ill. App. 3d 121, 128 (2007)).

¶ 41    At the outset, we note that the trial court's comments that defendant highlights comprise eight sentences interspersed throughout the court's other comments spanning six pages of the report of proceedings for the sentencing hearing. When viewed in the context of the record as a whole, these remarks do not indicate that the court disagreed with the jury's verdict.

¶ 42    Specifically, the trial court's comments regarding defendant's lack of justification for Flowers' murder comported with the definition of second degree murder. "Second degree murder differs from first degree murder only in the presence of a mitigating factor, such as an alleged provocation or an unreasonable belief in justification." *People v. Johnson*, 2013 IL App (1st) 103361, ¶ 25; see also *People v. Jeffries*, 164 Ill. 2d 104, 129 (1995) (an unreasonable belief in the need for self-defense "supports a finding of second degree murder" but is "not absolute justification for the defendant's actions").

¶ 43    Here, before returning its verdict for second degree murder, the jury was instructed regarding the mitigating factors of serious provocation and an unreasonable belief in the need for deadly force. The trial court, in imposing its sentence, noted that Flowers struck defendant but that defendant exhibited "no hesitation" before shooting Flowers. The court also observed that evidence did not establish that Flowers exhibited an "aggressive stance" toward defendant before defendant fired. These comments do not suggest that the court disagreed with the jury's verdict; rather, the court accurately restated the evidence supporting the jury's determination that defendant committed second degree murder, either under serious provocation or with a mistaken belief in the need for self-defense. *Jeffries*, 164 Ill. 2d at 129; *Johnson*, 2013 IL App (1st) 103361, ¶ 25. The court is permitted to set forth the events of the offense in imposing its sentence. See *People v. Bowen*, 2015 IL App (1st) 132046, ¶¶ 50-52 (noting, in rejecting defendant's double-enhancement

claim, that the trial court may consider and comment on "the nature and circumstances of the offense").

¶ 44 Because defendant has failed to show the court held an opinion contrary to the jury's verdict that influenced the court's sentence, defendant has not demonstrated that a clear or obvious error occurred, and his argument under the plain error doctrine fails. *People v. Jackson*, 2022 IL 127256, ¶ 21 ("When a defendant invokes the plain error rule, the first step in the analysis is to determine whether a clear or obvious error occurred."). Similarly, as there was no error, defendant's ineffective assistance of counsel claim premised on counsel's failure to preserve the error also fails. *Redmond*, 2025 IL App (1st) 231795, ¶ 63 ("Counsel's performance cannot be considered deficient when no error occurred. Nor could defendant have suffered any prejudice by counsel's actions.").

¶ 45 Defendant next argues that the trial court failed to adequately consider statutory mitigating factors when imposing the maximum sentence. Specifically, he faults the court's supposed failure to properly weigh that when he committed the murder, (1) he was acting under strong provocation, (2) there were substantial grounds tending to excuse or justify his conduct, (3) he had been law-abiding for several years prior, (4) his criminal conduct involved circumstances unlikely to recur, and (5) his character and attitude made him unlikely to commit another crime. See 730 ILCS 5/5-5-3.1(a)(3)-(4), (7)-(9) (West Supp. 2015)). Defendant also argues that the court overlooked his "demonstrated capacity for rehabilitation" and the remorse he expressed at sentencing.

¶ 46 A trial court has broad discretion when fashioning a defendant's sentence. *People v. Rich*, 2025 IL App (1st) 230818, ¶ 43. "This is because a trial court has a superior opportunity 'to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social

environments, habits, and age.' " *People v. Branch*, 2018 IL App (1st) 150026, ¶ 34 (quoting *People v. Stacey*, 193 Ill. 2d 203, 209 (2000)). Consequently, we will give its sentence great deference and will only overturn its decision for abuse of discretion. *People v. Colone*, 2024 IL App (1st) 230520, ¶ 134.

¶ 47 A trial court must " 'consider all factors in aggravation and mitigation' " when crafting a sentence, and the appellate court will not reverse the sentence solely because it would have weighed the factors differently. *Id.* ¶¶ 134-35 (quoting *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007)); see also 730 ILCS 5/5-4-1(a)(4) (West 2014). Additionally, "the presence of mitigating factors" neither "require[s] a minimum sentence" nor "preclude[s] a maximum sentence." *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. A reviewing court presumes that the trial court considered the evidence presented at sentencing absent an affirmative showing otherwise. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38. We also presume a sentence within the statutory limits is proper, and such a sentence will only constitute an abuse of discretion if it is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *People v. Webster*, 2023 IL 128428, ¶ 21 (quoting *Stacey*, 193 Ill. 2d at 210).

¶ 48 Defendant was convicted of second degree murder (720 ILCS 5/9-2 (West 2016)). The sentence for this crime ranges from 4 years' to 20 years' imprisonment. 730 ILCS 5/5-4.5-30 (West 2016). Defendant was sentenced to 20 years' imprisonment, within the statutory limits. We will presume this sentence proper unless defendant affirmatively demonstrates otherwise. *Burton*, 2015 IL App (1st) 131600, ¶ 36.

¶ 49 As noted, this court presumes that the trial court considered any mitigating evidence absent an affirmative showing by defendant otherwise. *Id.* ¶ 38. Defendant has failed to rebut this

presumption. In fact, the court expressly stated that it considered "all the statutory and nonstatutory factors in aggravation and mitigation" and "the objective of restoring the defendant to useful citizenship." It also stated that it had considered defendant's PSI, his supportive family, his allocution, and his educational efforts while incarcerated. As also noted, this court will not reweigh mitigating factors on appeal (*Hussein*, 2024 IL App (1st) 230471, ¶ 46), and "the presence of mitigating factors" does not "preclude a maximum sentence" (*Harmon*, 2015 IL App (1st) 122345, ¶ 123). The mitigating factors defendant highlights did not preclude the court from imposing the maximum sentence of 20 years' imprisonment, and we cannot ascribe different values to the mitigating factors on appeal. *Hussein*, 2024 IL App (1st) 230471, ¶¶ 46-47. Consequently, nothing in the record warrants disturbing defendant's sentence.

¶ 50    For these reasons, we affirm the circuit court's judgment.

¶ 51    Affirmed.